No. 29,778.

THE EL DORADO NATIONAL BANK, *Appellee*, v. FRED E. EIKMEIER, MARY EIKMEIER and H. H. FAULDERS, *Appellants.*

(300 Pac. 1085.)

Opinion filed July 3, 1931.

*F. Dumont Smith, J. N. Tincher, Don Shaffer, Clyde A. Raleigh* and *Mabel Jones Shaffer,* all of Hutchinson, for the appellants.

*C. L. Harris* and *F. J. Leasure,* both of El Dorado, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action by the assignee and holder of non-negotiable promissory notes against the makers and assignor. The makers, whom we shall speak of as defendants, admitted executing the notes, but pleaded failure of consideration and fraud which

induced their execution. The trial court sustained a demurrer to their evidence and they have appealed. Broadly speaking, the question for our determination is whether there was evidence which should have gone to the jury.

The action was on two notes for $3,000 each, dated October 31, 1925, due in one year, signed by Fred E. Eikmeier and Mary Eikmeier, made payable to H. H. Faulders, and by him indorsed. The notes were in the usual form of negotiable promissory notes except that each of them contained this statement: "This note is given in payment of shares in the Sparta Petroleum Co." Under our statute (R. S. 17-1220) this rendered the notes nonnegotiable "and subject to all laws governing nonnegotiable commercial paper." Plaintiff alleged, in substance, that the notes were made for a valuable consideration, that plaintiff purchased them for value before maturity, and that they were due and unpaid; set up copies of the notes, and prayed for judgment. Defendants answered, admitted signing the instruments sued upon, denied they had ever received any consideration for signing the notes, alleged that they were not negotiable, and that plaintiff had no rights thereunder greater than H. H. Faulders had, and that they were induced to sign the notes by the false and fraudulent representations of Faulders: (1) That the shares of stock in the Sparta Petroleum Company were worth more than one hundred cents on the dollar, when in fact he knew the shares had no value; (2) that the Sparta Petroleum Company was a going concern, had large and extensive property holdings, and was operating in the oil business on an extensive scale, when in fact it was not operating at that time, its charter to do business was forfeited, and that Faulders had no authority to sell stock in the company; (3) that Faulders represented that the Sparta Petroleum Company, as a consideration for the notes, would drill a well on land owned or controlled by defendants in Pawnee county, and would begin drilling within thirty days, which representation was known by Faulders to be false at the time it was made. Plaintiff, in a reply, denied the defenses set up in the answer, alleged that in fact the shares of stock of the Sparta Petroleum Company were delivered to defendants, that they knew the stock was being issued and sold for the purpose of raising money to complete a well then being drilled on a leasehold in Butler county owned by the corporation, and knew it was the purpose and intent of the payee to sell and transfer the notes in order to get money to carry on the

operations of the corporation; that with such knowledge, and to assist the payee in selling the notes, the defendants, about the time the notes were purchased by plaintiff, made and caused to be delivered to plaintiff a property statement in writing showing they had property sufficient to justify plaintiff in purchasing the notes, and that by reason thereof plaintiff was induced to and did purchase them from Faulders in good faith, and paid therefor their face value, less a discount of eight per cent; that the proceeds of the notes were in fact used by the corporation for its operations; that shortly after the execution of the notes and the delivery of the stock Fred E. Eikmeier became a director and vice president of the Sparta Petroleum Company, and as such officer took part in its direction and management, by reason of which facts defendants are estopped to deny the validity of the notes and their liability thereon to plaintiff.

Plaintiff's evidence was that it purchased the two notes, one November 6, the other November 12, 1925, and paid the face value thereon, less an eight per cent discount; that the notes were purchased from H. H. Faulders, and the amount paid for them was credited to his personal checking account (whether the money was still in that account, or had been checked out, and, if so, for what purpose, is not shown by the record) ; that the Sparta Petroleum Company did not come into the matter, so far as plaintiff was concerned; that plaintiff required a property statement from defendants before it purchased the notes, and that Faulders brought to plaintiff a property statement which had been executed by defendants, which showed they had property in sufficient amount to justify plaintiff in purchasing the notes; that plaintiff's officers did not see defendants, but transacted all their business with Faulders.

Other evidence tended to show substantially the following facts: The Sparta Petroleum Company was incorporated under the laws of this state with an authorized capital of $500,000, of which shares representing about $250,000 had been issued. H. H. Faulders held half or more of the issued shares. He was president and general manager of the company, and apparently controlled or dominated its activities. The assets of the company appear to have consisted of oil and gas leases on two forty-acre tracts of land in Butler county, on which E. H. Faulders, wife of H. H. Faulders, had an overriding royalty. These assets appear to have been encumbered by a mortgage to the plaintiff bank for $20,000, although the date of that mortgage is not shown by the record. The company never

paid any dividends on its stock. At the time the notes sued on in this action were given a well had been drilled on one of the forty-acre tracts and was producing oil—the amount of which was not shown—and another well was being drilled.

Defendants lived in Pawnee county, where they owned 1,280 acres of land and other property, and were ambitious to have oil development in their locality and a well drilled on their land. One of their neighbors and friends was T. H. Crumley, who had made a study and practice for some years of locating places to drill for oil or gas. Sometime in September, 1925, Crumley, at Faulders' request, met him in Wichita. Faulders had Crumley go to Butler county and locate places to drill two wells on leases held by the Sparta Petroleum Company. Perhaps Crumley made two trips to see Faulders. On the trips, or one of them, Faulders told Crumley that he knew what the state law was; that if he, Crumley, brought to Faulders anyone who would buy stock he would pay Crumley ten per cent. He asked Crumley to see defendants and see if they would buy ten or twenty-five thousand dollars' worth of Sparta Petroleum stock. Crumley said he would not do this; that the only proposition defendants would consider would be to have a block leased near their premises and a well drilled on their property. Faulders said he would do that. On returning to his home Crumley conveyed this information to defendants. They asked Crumley to have Faulders come to Pawnee county to see them. This was done. Perhaps Faulders saw them there more than once. At any rate, on October 31, 1925, the defendants, Crumley, Faulders, and a man by the name of Kelly, who appears to have been associated in some way with Faulders, met at a hotel in Larned. Faulders talked to defendants about selling them stock in the Sparta Petroleum Company and represented the company to be in good shape, its stock to be worth 100 cents on the dollar, and that at the first of the year there would be a 12 per cent dividend paid. Defendants told him they did not want to buy stock and were not interested in the Sparta Petroleum Company, but were interested in a well being drilled on their land; that they were then buying a certain half section of land and wanted the well drilled on that land. They told Faulders that if he would block up land for leases and drill a well on their property they would take $10,000 worth of the stock, if all the money they paid for it would go into the well on their land. Faulders said he would do that. He stated he had a drilling rig in

Chase county—about forty miles from defendants' land—which was completing a well, and which he would move there soon to drill on defendants' land, and that he would take leases on the acreage at once. He employed Crumley to get the leases, and agreed to pay him ten cents per acre, and to pay a dollar an acre for the lease. Drilling was to begin on defendants' land in ninety days. A drilling contract was drawn up and executed. This had been lost by the time of the trial, but the fact of the execution was not controverted. Defendants executed to Faulders three notes for $3,000 each and paid him $1,000 in cash. This money, or proceeds of the notes, was to be used only to pay for blocking the acreage and drilling on defendants' land. Defendants did not want to make that deal unless they completed the purchase of the half section they were then buying, and Faulders gave them a written statement in the form of a letter that he would not use the notes until that purchase was consummated, and if it were not, the notes should be returned. Defendants consummated the purchase of this land. Shares of stock in the Sparta Petroleum Company of the face value of $10,000 were delivered to defendants on the date the notes were executed, or a few days later. On November 10, 1925, Kelly went to defendants, said they needed money to block up the leases and get the drilling rig moved to defendants' farm, and would have to use for that purpose one of the notes defendants had executed, and that arrangements had been made to handle it at the Union National Bank at Wichita, but the bank wanted the note payable directly to it, and wanted a property statement from the makers. Defendants executed a new note, payable to the Union National Bank, for $3,000, in lieu of one of the notes previously executed to Faulders (this note is not sued on in this action), and also executed in triplicate a property statement on forms used by banks for that purpose. Soon after the notes in suit were executed Crumley started to get leases for Faulders to block up the acreage near defendants, and secured contracts for leases on 3,794 acres, but was unable to close them because Faulders furnished no money for that purpose, and he had to quit. No drilling rig was moved to defendants' land nor leases taken by Faulders, as he had agreed to do when the notes were executed, and later, when he was asked about it, he said, with an oath: "I never did intend to drill that well no time."

In January, 1926, Crumley and the defendant Fred E. Eikmeier met Faulders at Wichita and they drove to El Dorado, where they

were supposed to have a meeting of the stockholders of the Sparta Petroleum Company. A meeting was held in an office that evening, attended by five or six men. Faulders wanted authority to borrow $38,000 or $40,000 to complete the drilling of certain wells in Butler county; Eikmeier wanted the minutes of the previous meeting read; Faulders said that wasn't necessary. It appears that Eikmeier took no further part in the proceedings, although he remained at the meeting, and by a vote taken Faulders was authorized to borrow the money. On February 15, 1926, the Sparta Petroleum Company, by its president, Faulders, and secretary, executed a note to the plaintiff bank for $38,000, and secured the same by a mortgage on all its assets, and on June 4, 1926, this amount was increased to $52,-000, for which a new note and mortgage was given, which mortgage was foreclosed.

On February 8, 1926, Faulders and his attorney met defendants at Wichita, and they entered into a contract with Faulders, as party of the first part, and these defendants, as parties of the second part, which recites, by way of preamble, that on October 31, 1925, the second parties had executed three notes for $3,000 each to first party and paid him $1,000 in cash, and that the first party had issued to them shares of stock of the face value of $10,000 in the Sparta Petroleum Company, and "it is the desire of the parties hereto to rescind the above contract and to place each other in the same condition they were in prior to the delivery of the said notes and to the issuance of the said stock," and that second parties desired to deliver back the stock and to receive their notes and the $1,000 paid, "holding the said party of the first part free and clear of any claim of fraud or misrepresentation in the issuance of the stock aforesaid," and which provided:

"Now, therefore, for and in consideration of the promises and agreements hereinafter mentioned, the said party of the first part agrees to deliver back to the said party of the second part on or before the 1st day of October, 1926, the three promissory notes in the sum of three thousand ($3,000) dollars each and shall deliver back and pay to the said party of the second part the sum of one thousand ($1,000) dollars on or before the first day of May, 1926, and the said party of the second part agrees to deliver back to the said party of the first part, and to the Sparta Petroleum Company the one thousand shares of the capital stock which has been heretofore issued to the said party of the second part, and said delivery of the stock to be made when the promissory notes above referred to have been delivered back to the said party of the second part.

"It is understood and agreed between the parties hereto, that in the event any dividends are declared upon the capital stock now held by the party of the second part, it shall be paid to and delivered to the said party of the first part."

When this contract was made, it does not appear that defendants knew plaintiff had purchased the notes sued upon. Faulders did not repay the $1,000 promptly on May 1, 1926, and on May 15 Eikmeier went to El Dorado to see him about it. As soon as they met, Faulders asked if he had been to any bank. Eikmeier said, "No," and Faulders said, "That's fine," and that he would give him a check for the $1,000, which he did, and which check, after some delay, was paid.

Turning now to the legal questions argued. We pass for the present, to be considered later, the effect of the contract of February 8, 1926, between Faulders and the defendants.

We first observe that the notes sued upon are nonnegotiable, made so by statute (R. S. 17-1220), which fact is shown by the recital which appears on the face of the notes. It is the general rule, well established by the authorities, that the payee of a nonnegotiable note takes it subject to all equities in favor of the maker, and in this respect the holder of such a note, by assignment or transfer from the payee, stands in no better position. Among the defenses which the maker of the nonnegotiable note, when sued upon it, may make, if the facts warrant them, are: (1) A want or failure of consideration, in whole or in part; and (2) fraud which induced the execution of the note. Defendants in this case pleaded both of these defenses. Let us consider the evidence with relation to them.

As to the want or failure of consideration, we observe that the notes contained the words, "for value received," and also the statement that they were given in payment of shares in the Sparta Petroleum Company. But these recitals do not prevent an inquiry into the actual consideration, and do no more than to place upon the defendants the burden of proof of want or failure of consideration when that defense is made. (8 C. J. 994; 1 Joyce, Defenses to Commercial Paper, 2d ed., § 322.) Appellee calls our attention to the fact that no witness expressed a judgment, or stated his opinion, as to the value of the shares of stock of the Sparta Petroleum Company at the time the notes were executed. While that is true, there is evidence in the record that shares of the face value of more than $250;000 had been issued. There is also evidence as to the assets of the company from which a jury might well have

concluded that, aside from a speculative value, their actual value was but a small per cent of their face. But, passing that thought, there is evidence that the shares of stock, whatever may have been their real or speculative value, entered into the actual consideration of the notes to a small extent, if at all. The real consideration was that Faulders, or the Sparta Petroleum Company, which he managed and dominated, would lease up a block of acreage in defendants' vicinity and drill a well on their land. This was not done. So far as the agreement to do that entered into the consideration of the notes sued upon, there was a failure of consideration. It is suggested by appellee that, in view of the fact that no definite sum was fixed by any witness as to the value of the shares of stock, the jury would have no basis from which to compute the amount of the failure of consideration by reason of not carrying out the contract to block the acreage and to drill a well. When the consideration for a nonnegotiable note is an unliquidated amount, the courts, at times, have experienced difficulty in formulating rules for determining that fact. Perhaps the holdings have not always been harmonious. (8 C. J. 752, and cases there cited.) We see but little, if any, more difficulty in the question than in those which frequently confront courts and juries in determining unliquidated damages, or unliquidated sums due in other cases.

If the stock of the Sparta Petroleum Company actually entered into the consideration of the notes given, then it would seem, from the evidence, that the consideration of the notes consisted of two things: (1) The stock of the Sparta Petroleum Company, and (2) the agreement to secure a block of leases and to drill a well on defendants' land. Under the evidence the latter of these failed completely. In that event the question would have to be determined: What portion of the consideration was for the stock, and what portion for the agreement? No more could be recovered than the value of the stock. (*Dewey v. Bobbitt,* 79 Kan. 505, 100 Pac. 77.) If it should be determined that the sole consideration for the giving of the notes was the agreement above mentioned, then naturally there would be a total failure of consideration. These questions should have been submitted to the jury.

On the defense of fraud which induced the execution of the notes, evidence was offered in support only of the first and third fraudulent representations pleaded. As to the first, there was evidence that Faulders represented to defendants that the stock of the Sparta

Petroleum Company was worth 100 cents on the dollar, and that it would, at the first of the year (then only two months in the future) pay a dividend of 12 per cent. Appellee argues that this was no more than the expression of an opinion and "puffing" talk. The representation that the company would soon pay a dividend of 12 per cent might well have been construed as a representation that the company was then making money in such an amount that from its earnings it might reasonably be expected that the stated dividends would be paid. The statement as to the value of the stock, in view of Faulders' position as president and general manager of the company, may have been made with the intention that defendants would rely upon it, and if made with that purpose, and was in fact false and defendants did rely upon it, the jury might find it to constitute actionable fraud. (*Fourth Nat'l Bank v. Webb*, 131 Kan. 167, 290 Pac. 1, and annotations thereon; 71 A. L. R. 622.) It is not at all clear, however, from the evidence that defendants relied upon that. Their evidence is that they paid but little attention to this stock, or its value. They simply took it as a means to get Faulders to agree to take leases in their neighborhood and to drill a well on their land, which they were anxious to have done.

Upon the third element of fraud pleaded—the promise to block up leases in the vicinity of defendants' land and to drill a well on their land—there is evidence those promises were made, that defendants relied upon them, that they were the inducing cause of the signing of the notes, and that they were never complied with. The simple fact that the promises were made and were not complied with would go to the failure of consideration as distinct from fraud. Appellee argues they could not amount to actionable fraud because they were not representations as to a present or past condition, but related solely to the future. It is the general rule that fraudulent representations, to be actionable, must relate to existing or past facts or conditions; but a promise to do something in the future, if the promisor had no intention at the time he made the promise, to carry it out, is deceit, and if the promisor obtained anything of value by reason thereof it amounts to actionable fraud. (*Shriver v. National Bank et al.*, 117 Kan. 638, 232 Pac. 1062.) There is positive evidence in this case that Faulders' later statement was that he had no intention at any time of drilling a well on defendants' land, and the evidence relating to his conduct with respect to obtaining leases and drilling on defendants' land accords with that view.

There is, therefore, evidence of deceit and actionable fraud sufficient to go to the jury.

We come now to consider the effect upon the parties to this action of the contract of February 8, 1926, between defendants and Faulders. Appellee points out that this contract was not pleaded by the defendants, and argues that it is not properly an issue in the case, and therefore not available as a defense. It was, however, introduced in evidence and, so far as the record discloses, was taken into consideration by the court in passing on the demurrer to the evidence. We are unable to see that the contract had much effect on the rights of the parties to the action. Plaintiff was not a party to that contract and, so far as the record discloses, defendants did not know at the time it was executed that plaintiff had or claimed any interest in the notes. It is true that the defenses to a note of failure of consideration, or fraud which induced its execution, are personal to the maker, and he can waive them if he desires. But waiver in such a case is largely a matter of intention. (*Van Natta v. Snyder,* 98 Kan. 102, 157 Pac. 432.) It is quite clear defendants were not intending to waive anything by this agreement. What they were doing was rescinding *in toto* their contract with Faulders. In so far as their deal with Faulders was executory the rescinding of it, and the relieving of Faulders of his obligation to carry out the terms of his agreement with defendants, would result in a failure of consideration for the notes, to the extent at least that Faulders' agreement to do something entered into the consideration. (*Marckel v. Taplin,* 13 Dom. L. R. 118. See other cases cited on this point, 8 C. J. 747, 748.) But Faulders had already failed to block up leases in defendants' vicinity and to drill a well on their land. In so far as the agreement to do so entered into the notes, that consideration had already failed, so the contract of February 8, 1926, had but little, if any, bearing on that phase of the question. Appellee argues that by this contract defendants recognized their ownership of the stock in the Sparta Petroleum Company and were to continue to hold it until Faulders delivered to them their note, at which time the stock was to be delivered to him. But the contract provided that any dividends paid on the stock should belong to Faulders. The result is that the stock became the property of Faulders on the execution of this agreement, the defendants simply holding it for him and he to have the beneficial interest therein. It is difficult to see how the plaintiff bank could be regarded as having

been placed in any better position by reason of this contract. As holders of the notes sued upon, the notes were all the time, both before and after this contract was executed, subject to equities in favor of defendants to the same extent as though Faulders himself had sued upon the notes. It is clear that if Faulders had brought suit on the notes after this contract was executed his rights to recover would not have been increased by reason of the contract. We are unable to see that plaintiff's rights were increased by it.

From what has been said it necessarily follows that the judgment of the court below must be reversed with directions to grant a new trial. It is so ordered.