No. 35,314

THE OLSBURG STATE BANK, *Appellee,* v. OSCAR ANDERSON, *Appellant.*

(119 P. 2d 515)

Opinion filed December 6, 1941.

512

*B. C. Pickering*, of Wamego, for the appellant.

*E. C. Brookens, John W. Brookens*, both of Westmoreland, *Charles Hughes* and *C. Harold Hughes*, both of Manhattan, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action on a promissory note by the payee against the maker. The note was for $1,000, dated December 4, 1939, due March 4, 1940, and the action was filed April 6, 1940. The defense was lack of consideration and that the execution of the note was induced by fraud. The trial court sustained a demurrer to defendant's evidence and he has appealed.

The plaintiff bank is situated in the town of Olsburg. We take judicial notice that it is a city of the third class, situated in a rural community. The evidence may be summarized as follows: The active managing officer of the bank at the time in question appears to have been D. W. Johnson, Sr., cashier, who had been connected with the bank for more than forty years. His son, D. W. Johnson, Jr., was assistant cashier. In the fall of 1939 two brothers, C. E. Olson, who lived at Wichita and had been engaged in the oil business for more than twenty years, and L. E. Olson, who lived at Manhattan and had been engaged in the same business about twelve years, went to Olsburg and had an agreement with the two Johnsons by which together they would undertake to get oil leases and mineral deeds and handle them or dispose of them in such a way as to make a profit, which would be divided among them. The bank was the headquarters for these operations. D. W. Johnson, Jr., went with one or both of the Olsons through the country getting leases, and because of his large acquaintance proved to be helpful. Altogether they got leases on approximately 28,000 acres. These were taken in the name of one of the Olsons, or D. W. Johnson, Jr., and had not been recorded. The first leases were taken in September, 1939. On October 27, 1939, under the supervision of D. W. Johnson, Sr., a written agreement was entered into by the two Olsons and D. W. Johnson, Jr. D. W. Johnson, Sr., stated that his name had to be kept out of it because of his connection with the bank. This provided that the net proceeds from the operation should be divided among the signers of the instrument equally, and that all sales of leases or "royalties" were to be made through the plaintiff bank. Notwithstanding the form of this agreement, there is testimony indicating that the understanding of the parties was that D. W. Johnson, Sr., was to have the same share as the rest of them, and that

his name was omitted from the written agreement for business reasons only. The bank, through D. W. Johnson, Sr., made small loans to each of the Olsons. The number and amount of these is not specifically disclosed. Perhaps he also advanced some of his personal funds for expenses. On October 28 D. W. Johnson, Jr., let C. E. Olson have $125. These loans or advancements apparently were deposited in the plaintiff bank and checked on by the Olsons. Some of their checks were returned. D. W. Johnson, Sr., repeatedly urged the Olsons to get in some money.

The defendant, Oscar Anderson, about sixty years of age, lived on a farm a few miles from Olsburg, had leased about 1,200 acres of his land, and had advanced some expense money to the Olsons, but the amount of those advancements, or the circumstances under which they were made, are not disclosed. Within a week before the execution of the note sued on defendant executed a note to C. E. Olson for $1,000 or $1,500 (the testimony is confusing as to the amount) upon the representations of the Olsons that they needed money to have a drilling rig brought into the neighborhood, and stated that the money would be used for that purpose and that the drilling rig would be brought in within a week. According to the testimony of C. E. Olson, Anderson had given him a note for $1,000, which he took to the bank on the afternoon of December 3 (which was a Sunday), endorsed the note, and that D. W. Johnson, Sr., gave him a deposit slip for $1,000, the amount of the note; that the next morning D. W. Johnson, Sr., told him that he would have to take up that deposit slip, that he did not want a "three-cornered note," that the banking authorities might object to it, and that if Anderson would make a property statement and make a note for $1,000 payable to the bank, the bank would take the note. So there was prepared at the bank that morning a note payable to the bank for $1,000, dated December 4, 1939, and due March 4, 1940, and a deposit slip for that amount, of the same date, and a check to C. E. Olson for $1,000 for Anderson to sign. Apparently both the Olsons and both the Johnsons were present when this transaction occurred, and C. E. Olson testified, "The bank, D. W. Johnson, Sr., controlled the deal." D. W. Johnson, Sr., told them that if they would take those papers out there and get Anderson to sign the note payable directly to the bank, and to make a property statement, that the bank would handle the matter. It appears both of the Olsons and D. W. Johnson, Jr., went out to see Anderson to get

him to fix up this deal the way D. W. Johnson, Sr., wanted it done. C. E. Olson testified that he and D. W. Johnson, Jr., went out in a car together, that his brother, L. E. Olson, was not there; but L. E. Olson testified he was there, and as to what took place at that time. Anderson testified that D. W. Johnson, Jr., and C. E. Olson were there; that he thought L. E. Olson was there, but was not quite sure. They met Anderson in the yard and talked at the car. Anderson was told that the bank did not want to handle the former note he had executed, but if he would make a note directly to the bank and accompany it with a property statement the bank would handle the matter. They did make out a property statement. D. W. Johnson, Jr., had the blank for that purpose and asked the questions and filled it in, and Anderson signed it. For some unexplained reason this statement was dated December 1, 1939. It did not list or value real estate, but showed personal property of the value of more than $20,000 and no indebtedness. Defendant testified he was told on that occasion that this was to take the place of the other note, which was surrendered to him then, and was further told that the drilling machinery would be in there in a few days, and that this money was to be used for that purpose; that he relied on those statements; that he was not told the Olsons were indebted to the bank or to the Johnsons, and would not have signed the note if he had known the proceeds were to be used to pay debts to the bank or to Johnsons. C. E. Olson testified defendant was told that the drilling rig was to be brought in; that he had been told that before and knew it, and that he believed it; that he was also told the note was to be used "for the deal" and that "we owed." The defendant signed the note sued on in this case, which had been prepared at the bank that morning. He was given a deposit slip for $1,000 and he signed the check to C. E. Olson on the bank for $1,000. D. W. Johnson, Jr., and the Olsons then returned to the bank. D. W. Johnson, Sr., said he wanted his money paid out of it, so there was paid to the bank the indebtedness of the Olsons and perhaps some other money to the Johnsons, and some of it was left on deposit in the bank. The exact figures on these payments cannot be obtained from the evidence. C. E. Olson placed the amount left in the bank on deposit as somewhere between $400 and $600, but his testimony also disclosed that only a part of his brother's indebtedness to the bank was paid.

The evidence indicates that none of the money, being the pro-

ceeds of this note, was used to bring a drilling rig into the community. In fact, no drilling rig was brought in until the next August, about nine months later. There is no suggestion that any part of the money represented by this note was used to have that rig brought in.

In his answer defendant had alleged the two Johnsons and the two Olsons were partners in this oil business. Appellee argues there was no evidence of this partnership, and particularly points to the agreement between the two Olsons and D. W. Johnson, Jr., of October 27. There is testimony, however, that the deal was made with both Johnsons. Quite a few of the leases had been taken before October 27, and on that date, under the direction of D. W. Johnson, Sr., for the purpose, and possibly for the sole purpose, of having some record which would indicate he was not a party to the transaction, this particular contract was drawn up. The evidence further tends to show that the agreement among them was to procure and deal in these oil and gas leases and mineral deeds and handle them in a way to make money out of them, and to divide the net earnings. There was no limitation of time, or of the extent of operations. It therefore had the essential elements of a partnership. (47 C. J. 640; *Stone v. Boone,* 24 Kan. 337, 340.)

In support of the judgment of the trial court it is argued on behalf of the appellee that the fraudulent representations, even if made, were not actionable because they related to what was to be done in the future; that is to say, the drilling rig was to be brought in within the next few days, and they cite cases applying the general rule that fraudulent representations in order to be actionable should apply to existing or past matters and not to those which are to take place in the future. This is a well-established rule and may be supported by many authorities. (26 C. J. 1087; *Kiser v. Richardson,* 91 Kan. 812; 139 Pac. 373; *Pioneer Nat'l Life Ins. Co. v. Hall,* 145 Kan. 785, 67 P. 2d 518.) To prevent it, however, from being an aid to fraud there are limitations to the broad statement of the rule. (See 26 C. J. 1090.) If when the representations are made respecting what is to be done in the future there is no real intention on the part of the person making such a representation to do in the future the thing represented, the then existing false intention is sufficient to form the basis of liability for false representation. (See 23 Am. Jur. 885, and cases there cited; *Richardson v. Simpson,* 88 Kan. 684, 129 Pac. 1128; *El Dorado Nat'l Bank v.*

*Eikmeier,* 133 Kan. 412, 300 Pac. 1085.) We think there is room here for a jury to say that when it was represented to defendant that the proceeds of this note were to be used to bring in an oil rig within a few days, those making the representations had no hope or intention of using the money for that purpose; and certain it is that they did not so use it. The jury should have been permitted to pass upon the question.

The judgment of the court below is reversed with directions to grant a new trial.