**In re Raymond Dale ABRAHAM, Debtor.**

**Douglas P. Lytle, Plaintiff,**

v.

**Raymond Dale Abraham, Defendant.**

**Bankruptcy No. 98–22259–7. Adversary No. 98–6114.**

United States Bankruptcy Court, D. Kansas.

April 3, 2000.

Brian G. Boos of Moser and Marsalek, P.C., Kansas City, MO, for Douglas P. Lytle.

Mark Allen Roy of the Debt Relief Center, P.C., Overland Park, KS, for Raymond Dale Abraham.

### MEMORANDUM OPINION[1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

The adversary complaint alleges that a state court contract judgment should be declared nondischargeable because the defendant committed either actual fraud or willful and malicious injury in the transaction.[2] The only testifying witnesses were the plaintiff and his employee, the defendant having failed to appear at the trial, although his counsel was present and participated. Nevertheless, the plaintiff failed to prove either actual fraud or willful and malicious injury. The court therefore finds for the defendant.[3]

Douglas P. Lytle, the plaintiff, operated Olympic Cabinets, a proprietorship engaged in custom cabinet-making and remodeling. Olympic Cabinets employed Gary Casey, a participant in the events leading to the complaint. Raymond Dale Abraham, the debtor/defendant, was an independent remodeling contractor who began doing business with Olympic Cabinets when he became disenchanted with his previous cabinet supplier. At some point, Douglas Lytle and Raymond Abraham began working together on some of the re-

---

1. The plaintiff, Douglas P. Lytle, appears by his attorney, Brian G. Boos of Moser and Marsalek, P.C., Kansas City, Missouri. Raymond Dale Abraham, the debtor/defendant, appears by his attorney, Mark Allen Roy of the Debt Relief Center, P.C., Overland Park, Kansas.

2. The state court judgment was for $12,406.66.

3. The court finds that this proceeding is core under 28 U.S.C. § 157 and that the court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.KAN.RULE 83.8.5).

modeling jobs awarded to Olympic Cabinets.

## I. *Defendant's Absence at Trial*

When counsel for the parties announced the appearances at trial, defendant's attorney, Mark Roy, proclaimed that his client, Raymond Abraham, was unaccountably absent. Roy was at a loss to explain his client's failure to appear.

Upon hearing this revelation, plaintiff's counsel, Brian Boos, moved orally for "summary judgment." The court overruled Boos' motion for summary judgment, advising him that the court could not grant the plaintiff relief without sufficient evidence. Although plaintiff had listed Raymond Abraham as a plaintiff's witness in the pretrial order and he was unaccountably absent, neither counsel moved for continuance of the trial. Raymond Abraham never appeared during the trial.

In his closing argument, Brian Boos alluded to the plaintiff's case having been weakened by Abraham's unavailability for questioning. This suggestion prompted the court to make a further record on Abraham's absence.

At the conclusion of the trial, the court directed Mark Roy to record the details of the notice he had given Abraham of the trial date. Roy then marked as Defendant's Exhibit A his letter to Raymond Abraham dated December 3, 1999, and as Defendant's Exhibit B his letter to Raymond Abraham dated December 21, 1999. Both letters advised Abraham of the correct trial date and time: January 20, 2000, at 9:00 a.m.

Mark Roy also revealed, however, that he had not spoken with Abraham for 30 to 40 days and that he had not recently met with Abraham to prepare him for the January 20 trial! Upon hearing about this unique approach to trial preparation, the court ordered that Douglas Lytle and Raymond Abraham appear with their attorneys at a status conference on February 1, 2000, at 2:30 p.m.

At the continued hearing, Raymond Abraham explained that he had not appeared at trial because he had overlooked the date on his calendar. The court then advised Abraham that if he wished to testify, the court would reopen the trial and afford him that opportunity at a later scheduled hearing. However, Abraham declined the invitation to testify. The court then asked Douglas Lytle if he wanted to call Abraham to testify at a later scheduled hearing. After consulting with his attorney, Lytle likewise declined the court's offer to hear Abraham as a witness.

## II. *Findings of Fact*

Sometime in 1993, Abraham informed Lytle that he needed work. Olympic had recently bid successfully on a $33,000 remodeling job, referred to as the "Horan job." Being shorthanded on this job, Lytle welcomed Abraham's participation. Not only did Lytle agree to pay Abraham for labor and expenses on the Horan job, he also agreed to share with him equally in the job profits.

About two weeks after the end of the Horan job in late August 1993, Abraham submitted his time and expenses to Lytle on a handwritten sheet. The sheet showed that Abraham had worked 241.5 hours at $12 per hour [4], but it did not include supporting receipts for any of the expenses. This omission bothered Lytle, but nevertheless he paid Abraham's bill. According to Lytle, the Horan job earned no profit, so he paid Abraham for nothing more than his labor and expenses. Abraham accepted the payment without objection.

Even so, Douglas Lytle contends that the payoff on the Horan job angered Abraham, causing him to want to get even with Lytle. By Lytle's account, Abraham executed a plan to order cabinets for which he did not intend to pay. Ostensibly, according to Lytle, Abraham ordered the cabi-

---

4. Plaintiff's Trial Exhibit 3.

nets from Olympic for a remodeling job he had in Topeka, Kansas.

Lytle supports his "get even" theory with several observations. First, Abraham took full responsibility for making the measurements for the cabinets. Second, he designed them with the aid of Olympic's draftsman, Kevin, without help from Lytle. And finally, Abraham did not tell Olympic where the cabinets were to be installed, but represented instead that he would deliver and install them personally.

Although there is no doubt that Abraham ordered the cabinets from Olympic, Lytle's evidence did not show the exact date of the order. Rather, through the testimony of Gary Casey, it only showed the approximate date Olympic completed construction of the cabinets. Casey identified two invoices, with attached shop drawings, each dated November 10, 1993. Plaintiff's Trial Exhibit 1 invoiced kitchen cabinets costing $4,175.34, and Plaintiff's Trial Exhibit 2 invoiced a home entertainment/bar combination costing $5,994.23.

At another unspecified time, Abraham asked Lytle to expedite the fabrication of the cabinets so Abraham could complete the Topeka job before the 1993 Thanksgiving holiday. To meet this request, Lytle held back other jobs to finish the cabinets in time.

By the completion date, however, Abraham had left for a hunting trip in Colorado. While on the hunting trip, Abraham telephoned Gary Casey and asked if a helper could pick up the cabinets in his absence. Abraham represented he would pay for the cabinets when he returned from his trip. Lytle testified that he trusted Abraham because they had worked together on several Olympic projects. He therefore authorized Casey to release the cabinets without advance payment. Abraham's representative appeared at Olympic on November 17, 1993, a Wednesday, and Casey released the cabinets to him.

Someone immediately returned two of the cabinet doors because they were either originally defective or were damaged in delivery. Olympic repaired the doors, and on the Saturday of the week following delivery of the cabinets, Abraham went to Olympic's shop to pick them up. As Abraham was driving into the Olympic parking lot, Lytle was driving out. The two men spoke, and Abraham told Lytle that he had come to pick up the doors and that he had a payment check for the cabinets. Lytle told Abraham to leave the check at the shop and take the doors; then Lytle left. Abraham took the doors from the shop but spoke to no one and neglected to leave the check for payment. Thereafter, Abraham did not respond to calls from Lytle and Casey seeking payment.

Consequently, on December 18, 1993, Lytle went to Abraham's home to collect for the cabinets. Upon being asked for payment, Abraham complained for the first time that Lytle had "screwed"[5] him on the Horan job. Lytle replied that he had paid Abraham $6,000 on a $30,000 project and asked what more Abraham thought he had coming. Abraham answered that he had not figured it out yet but would let Lytle know.

After this conversation, Abraham mailed Lytle a typewritten invoice listing jobs he had worked on for Lytle, including the Horan job.[6] The invoice, dated December 28, 1993, set forth amounts due for each job. For the Horan job, the invoice claimed "labor" of 331 hours at $37.50 per hour and "labor for Henry Abraham" of 121 hours at $17.50 per hour. (Henry Abraham is Raymond Abraham's brother, whom Lytle claims never to have hired.) At the bottom of the invoice, Lytle's payments to Abraham on the Horan job were deducted from the total amount claimed, leaving a balance due Abraham of $12,874.40. Lytle testified that the numbers offered in this document were specious,

---

**5.** Transcript of proceedings held January 20, 2000, at 34.

**6.** Plaintiff's Trial Exhibit 4.

noting that the hourly rates listed on the invoice exceeded the hourly rates he paid to his union workers. He also commented that the figures listed in Abraham's invoice were consistent "within pennies" [7] with the amount Abraham owed him for the cabinets.

Finally, Lytle testified on further redirect examination that the cabinets "were built for his [Abraham's] own personal house in Olathe." [8] When the court asked Lytle how he knew the cabinets were built for Abraham's home, Lytle replied that it had come out during Abraham's testimony at the state court trial. Interrupting, Lytle's attorney, Brian Boos, pointed to the stipulation in the pretrial order. The stipulation states: "At the trial of the underlying state court action, the defendant testified that he had some of the cabinets at his home in Olathe." [9]

Then, in response to the court's inquiry about how he knew the cabinets were built for Abraham's home, Lytle testified that in 1994 Abraham told him "he wasn't even sure he was going to finish putting the cabinets in, is what he told me." [10] "And that he also told me he was getting out of the business and he didn't have money to pay us and things of that nature." [11]

7. Transcript of proceedings held January 20, 2000, at 37.

8. *Id.* at 53.

9. Final Pretrial Conference Order filed December 1, 1999 (Doc. # 22), at unnumbered page 3.

10. Transcript of proceedings held January 20, 2000, at 54.

11. *Id.* at 54–55.

12. The elements of proof of actual fraud are familiar: (1) the debtor made a representation to the creditor; (2) the debtor knew at the time the representation was false; (3) the debtor made the representation with intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained loss or damage as a proximate cause of the false representation. *See Comerica Bank–Midwest v. Kouloumbris,* 69

### III. *Actual Fraud*

Lytle's first ground for nondischargeability is § 523(a)(2)(A), which excepts a debt from discharge to the extent it is obtained by actual fraud.[12] If a plaintiff charges that a promise or a statement concerning a future event was fraudulent, the plaintiff must show more than merely nonperformance of the promise.[13] The plaintiff must prove the promisor intended to deceive at the time he or she made the promise.[14] Since a promisor does not usually admit fraudulent intent, the plaintiff must prove circumstances substantial enough to support an inference that there was intent to defraud.[15]

Lytle first needed to prove that Abraham promised to pay in the future for the cabinets. Although the testimony of Casey and Lytle was confused on this point, Abraham having ordered and taken the cabinets implies such a promise. The court therefore takes as given that Abraham promised future payment.

Next, Lytle needed to present circumstantial evidence of sufficient weight to support an inference of Abraham's fraudulent intent at the time he made the promise of payment. But Lytle's evidence has

B.R. 229 (N.D.Ill.1986); *Citibank South Dakota, N.A. v. Dougherty (In re Dougherty),* 84 B.R. 653 (9th Cir. BAP 1988) (reciting elements for fraud under § 523(a)(2)(A)). The United States Supreme Court held in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), that justifiable reliance, rather than reasonable reliance, is the proper standard.

13. *Davsko v. Golden Harvest Products, Inc.,* 965 F.Supp. 1467, 1476 (D.Kan.1997). See also *El Dorado Nat. Bank v. Eikmeier,* 133 Kan. 412, 420, 300 P. 1085, 1089 (1931); *Denning v. Denning,* 155 Kan. 124, 127, 122 P.2d 713, 715 (1942); *Olsburg State Bank v. Anderson,* 154 Kan. 511, 515, 119 P.2d 515, 517 (1941); *Kuhn v. Seaton,* 187 Kan. 106, 108, 353 P.2d 959, 960 (1960).

14. *Davsko,* 965 F.Supp. at 1476.

15. *Id.*

failed to tip the scale in his favor. The evidence is that after Abraham ordered the cabinets for a Topeka job, he took control of measuring for and designing them without Lytle's involvement. After the damaged doors were repaired and he came to pick them up, he failed to leave a payment check. Later, when Lytle approached him for payment, Abraham claimed he had been "screwed" on the Horan job and that he was owed money. In response to Lytle's question of what Abraham thought was due him, he submitted a typewritten invoice listing the amounts he thought he was owed on various jobs, including the Horan job. His statement appears designed to offset Lytle's claim.

This proof, however, is insufficient support for an inference of fraudulent intent. It does not negate the reasonable possibility that Abraham's failure to pay was simply caused by his deteriorating financial picture, a condition the evidence does not show existed when Abraham promised payment.

Lytle needed to prove that Abraham's Topeka job was actually fictitious; but he did not. And he needed to prove that Abraham had not only designed the cabinets for his personal home, but had also installed *all* of them there. Proof of these additional facts could have tipped the scale in Lytle's favor.

True, although Lytle testified that the cabinets were built for Abraham's home and were installed there, his testimony conflicted with the stipulation in the pretrial order. The stipulation says: "At the trial of the underlying state court action, the defendant testified that he had *some* of the cabinets *at* his home in Olathe."[16] This stipulation falls short of proving that Abraham had built and installed the cabinets in his home. It merely says that *some* of the cabinets were *at* his home. Without proof that the Topeka job was non-existent, which has not been produced, Abraham's evasive actions could have been caused by problems he had with completing that job.

The court therefore concludes there is insufficient evidence from which to infer that Abraham harbored a fraudulent intent when he talked to Casey and Lytle in November 1993. To hold otherwise would be unsupported speculation.

## IV. *Willful and Malicious Injury*

■ Lytle's second ground for nondischargeability is § 523(a)(6), which excepts a creditor's claim from discharge if the debtor does willful and malicious injury to a creditor. The United States Supreme Court has recently addressed the scope of the "willful and malicious injury" exception in a medical malpractice claim.[17] The Court stated: "We confront this pivotal question concerning the scope of the 'willful and malicious injury' exception: Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury (as the Kawaauhaus urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)?"[18] The Court answered, concluding: "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[19]

■ Since the evidence fails to support an inference of an intent to deceive, it likewise fails to support an inference that when Abraham ordered the cabinets, he intended to injure Lytle, an essential element of proof under § 523(a)(6).

Yet another reason § 523(a)(6) is not applicable involves the timing of events

---

**16.** Final Pretrial Conference Order filed December 1, 1999 (Doc. # 22), at unnumbered page 3 (emphasis added).

**17.** *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

**18.** *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (footnote omitted).

**19.** *Id.*

under Lytle's "get even" theory. If Abraham was trying to "get even" for having been cheated on the Horan job, as Lytle contends, what did Lytle need to prove to show Abraham's intent to injure him? He needed to prove, of course, that the Horan job payoff took place before Abraham ordered the cabinets. If Abraham ordered the cabinets before the Horan job payoff, Lytle's theory would make no sense because Abraham would have no motive to injure Lytle. The proof, however, fails to show either the specific date of the Horan payoff or the specific date of the cabinet order. Without these critical dates, there is no substantial proof that Abraham ordered the cabinets after Lytle paid him for the Horan job. The only evidence the court would have upon which to base such a finding is the known date of the end of the Horan job (not the payoff), the date the cabinets were delivered, and Lytle's testimony about the normal fabrication time of the cabinets. The court finds that, in the absence of the specific dates that remain unproven, such evidence is an insufficient basis for an inference that Abraham ordered the cabinets after the payoff.

### CONCLUSION

Because the circumstantial evidence is insufficient to support an inference of either intent to defraud or intent to injure, the court concludes that plaintiff has failed to prove a prima facie case. On this state of the record, the court concludes that the only appropriate inference is that Abraham's failure of performance was merely a breach of contract.

The foregoing discussion shall constitute findings of fact and conclusions of law under FED.R.BANKR.P. 7052 and FED. R.CIV.P. 52(a). A judgment reflecting this ruling will be entered on a separate document in compliance with FED.R.BANKR.P. 9021 and FED.R.CIV.P. 58.

IT IS SO ORDERED.