Andrew B. SHAPIRO, Plaintiff

v.

Michael S. HAENN, et al., Defendants

No. 01–CV–101–B–S.

United States District Court, D. Maine.

Aug. 26, 2002.

See also 190 F.Supp.2d 64.

David M. Glasser, Esq., Camden, ME, for Andrew B. Shapiro, Plaintiff.

Michael S. Haenn, Bangor, ME, Daniel L. Cummings, Norman, Hanson & Detroy, Portland, for Michael S. Haenn, Camden National Corporation, Camden National Bank, Defendants.

## ORDER

SINGAL, District Judge.

Plaintiff claims that a bank and its attorney improperly filed a foreclosure action against him and pursued it after he had satisfied the underlying debt fully, in violation of state and federal consumer protection laws and state tort law. Four motions are presently before the Court: (1) Defendants Camden National Bank and Camden National Corporation's Motion for Summary Judgment (Docket # 33); (2) Defendant Haenn's Motion for Summary Judgment (Docket # 25); (3) Plaintiff's Motion to Strike (Docket # 31); and (4) Plaintiff's Motion for Partial Summary Judgment (Docket # 36). For the following reasons, the Court DENIES Plaintiff's Motions and GRANTS Defendants' Motions.

## I. LEGAL STANDARD

Plaintiff and each set of Defendants moved for summary judgment. A party is entitled to summary judgment in its favor if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Cross motions do not alter the basic standard: the Court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996).

Alternatively, the Court may grant summary judgment for a party that would prevail on the law even if all the disputed facts were construed in favor of its adver-

sary. *See id.* If, however, a reasonable jury could resolve a disputed fact in favor of either party, and that fact "has the potential to change the outcome of the suit under the governing law" depending on the party in whose favor the dispute is resolved, summary judgment is not warranted. *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. FACTS

### A. The Original Loan

In April 1993, Plaintiff Andrew Shapiro applied for a loan with Defendant Camden National Bank ("CNB")[1] in order to finance the purchase of land in Hilton Head, South Carolina. Shapiro claims that he intended to use the land as a site for his retirement home and communicated his intentions to Ted Hanley, the CNB officer who processed his loan application. Shapiro's version of his discussions with Hanley is not recorded on any of CNB's loan documents. Instead, the loan file contains a document, dated June 3, 1993, and titled "Business Loan Application," that identifies the purpose of the loan as "investment property on Hilton Head, S.C." (*See* Business Loan Application (Docket # 45, Matteo Aff., Ex. A).) CNB claims this document is written in Hanley's hand.

On June 3, 1993, Shapiro executed a promissory note for $40,000 in favor of CNB, "due and payable" on June 3, 1994. The debt was secured by a mortgage on Shapiro's home in Camden, Maine, in which he lived with his then-wife Carol Smith (then known as Carol Shapiro).

Shapiro was the sole owner of the Camden home.

### B. The Divorce

Shortly after Shapiro executed the note, Shapiro and Smith separated, and Shapiro relocated to Hilton Head. The two divorced in 1994. Their divorce decree transferred Shapiro's entire interest in the mortgaged Camden home to Smith and provided that Shapiro was required to satisfy the $40,000 note and have the mortgage discharged. After the transfer, Smith continued to use the Camden home as her primary residence.

### C. Shapiro's South Carolina Residence

Shapiro used the loan proceeds to buy a plot of land in Hilton Head but did not begin construction on the land immediately. Construction began in 1998 and concluded in 2000. Between 1993 and 2000, Shapiro owned and lived in two other residences in Hilton Head, and on at least one occasion before construction was complete, he put the lot in question up for sale. It was not sold, however, and when the new residence was complete, Shapiro began living there. He has lived there since.

### D. Subsequent Loan Transactions

Meanwhile, the original promissory note matured on June 3, 1994. Hanley and Shapiro executed an allonge, which extended the maturity date on the loan to June 3, 1995. On June 3, 1995, when the note came due again, and at periodic intervals thereafter, Shapiro would sign a new promissory note for the outstanding bal-

---

**1.** The parties dispute whether Defendant Camden National Corporation is the sole shareholder of Defendant Camden National Bank (and thus not a proper party to this dispute) or a company doing business as Camden National Bank (and thus necessary). Because the Court finds that Plaintiff's claims against Camden National Bank fail as a mat-

ter of law, it is unnecessary to resolve this dispute. However, any reference in this Order to "Camden National Bank" is also intended to refer to Camden National Corporation, to the extent that it is not a separate entity and simply does business as Camden National Bank.

ance on the debt. The new balance reflected any payments he had made since the date of the previous note. He executed the fifth and final of these renewal notes on November 27, 1998, in the amount of $9,912.61.[2] Each new note was secured by the original mortgage deed on the Camden home.

Along with each note, Shapiro also signed a bank document entitled "Disbursement Request and Authorization," which summarized the amount and interest rate on the loan and its due date. Each document indicated that the "Specific Purpose" of the loan was to extend [the] maturity date of loan No. 99725 [the original promissory note] or "renew loan # 99725." (*See* Disbursement Requests (Docket # 45, Matteo Aff., Ex. B–F).) The documents identified the "Primary Purpose of the Loan" as "Business (Including Real Estate Investment)," as opposed to "Personal, Family or Household Purposes or Personal Investment." (*See id.*) Shapiro's signature appears on all five forms.

E. Initial Collection Attempts and the Commencement of the Foreclosure Action

The last of the five renewal notes matured November 27, 1999. Shapiro did not pay the balance on that date but instead asked CNB to give him until January 2000, to pay. CNB refused. When Shapiro still had not paid as of May 9, 2000, CNB officer Christopher Frohock sent him a letter advising him that he had breached "the terms and conditions of a Commercial Note dated November 27, 1998," and demanding payment in full by May 17, 2000. (*See* Frohock letter (Docket # 37, Shapiro Aff., Ex. 4).) The letter cautioned that if CNB did not receive payment by May 17,

the Bank would commence the "appropriate legal proceedings and/or recourse against any property pledged as collateral for the Note." (*See id.*) Shapiro did not protest that his was not a "commercial note"; in fact, CNB received no response to this letter.

On May 25, 2000, CNB turned the account over to its attorney, Defendant Michael Haenn, for foreclosure. Haenn is a solo practitioner who handled most of CNB's collection work during 2000. He estimated that during 2000, about ninety-five percent of his total practice involved loan collections. It was his practice to review the documents he received for each new debt collection matter personally in order to verify that they were complete and determine whether the loan was commercial or consumer in nature. One of the goals of his review was to determine whether he was required by law to send the debtor any notices before commencing litigation.

CNB provided Haenn with copies of Shapiro's loan documents, including the promissory notes, the documents entitled "Disbursement Request and Authorization" and Frohock's demand letter. Haenn reviewed them and observed that they consistently identified the loan as a "commercial" or "business" loan. Based on these documents, he concluded that the loan was commercial in character. He did not contact anyone at CNB to inquire about Shapiro's intended use of the money. He did, however, commission a title search on the Camden residence that secured the note, from which he learned that Smith, and not Shapiro, owned the Camden home.

Haenn concluded that Maine law did not require him to send notice to either Smith

---

**2.** The parties disagree about how to characterize the lending relationship these documents describe. However, whether each new promissory note represents a new loan, as

Shapiro contends, or merely a "renewal" of the old loan, as CNB claims, is not relevant to any dispositive issue in this case.

or Shapiro before he commenced the foreclosure action, and on or about June 6, 2000, he filed a foreclosure complaint in the Maine District Court in Rockland, Maine, on CNB's behalf against both Shapiro and Smith.

F. Shapiro's Effort to Avoid Foreclosure

On June 8, 2000, Shapiro telephoned Haenn to discuss paying off the loan; Haenn followed up with a letter the next day confirming that a foreclosure action had been commenced and informing Shapiro that he had a right to redeem the property. Thereafter, Haenn faxed a letter, dated June 15, 2000, to Shapiro's attorney, David Glasser, detailing the total payoff amount that would be necessary to redeem the property by the close of business on June 16. The letter indicated that Shapiro would owe $9,912.61 in principal, $653.21 in accrued interest, $51.08 in accrued late charges and $980.53 in legal fees and costs, for a total payoff amount of $11,597.43. It suggested that Shapiro could either wire the money to Haenn or have Glasser deliver a check to Frohock, who was handling Shapiro's account at the time.

On June 16, 2000, Glasser personally delivered a check for $11,597.43 to Frohock. The check contained this handwritten notation: "Payment under protest of claimed mortgage loan balance of Andrew Shapiro—Loan # 99725, Acct. # 8000910." (*See* Docket # 27, Ex. H.) When Frohock asked Glasser about the notation, Glasser replied that Shapiro was unhappy about the way CNB had handled the account but that he did not "dispute any amounts that [were] due under the note." (*See* Glasser Depo. at 9 (Docket # 45, Ex. 2).) The parties disagree about whether Glasser also indicated that Shapiro would not chal-

lenge the amount of the payoff. Frohock left the conversation with the impression that Shapiro was dissatisfied but would not challenge the payoff amount. Glasser claims that he chose his words carefully and, although he did tell Frohock that Shapiro conceded his liability on the note, he never said that Shapiro would not otherwise contest the amount.

Frohock consulted Haenn about the legal effect of the notation and what CNB should do with the check. He told Haenn he had spoken with Glasser, who told him that Plaintiff did not dispute the amount but was unhappy about the way CNB had handled the matter. Haenn responded that CNB could accept the check, and Frohock deposited it to CNB's account.

G. Continuation of the Foreclosure Proceedings

After CNB accepted the check, Haenn learned that Shapiro had filed an answer in the foreclosure action on June 19, 2000.[3] His answer raised as an affirmative defense that CNB failed to give the required notice under 14 M.R.S.A. § 6111 before proceeding with the foreclosure. Section 6111 provides that in certain circumstances, a mortgagee must provide thirty days notice of an impending foreclosure and give the mortgagor the chance to cure the default and avoid foreclosure. 14 M.R.S.A. § 6111. Shapiro's answer further asked the court to order CNB to return the portion of the payoff representing the attorney fees and costs incurred during the foreclosure action.

Although he was aware of Shapiro's answer, Haenn mailed a motion to dismiss the foreclosure action to the Maine District Court on June 20, 2000. He claims he did so because he believed, based on Frohock's

---

**3.** The state court docket sheet indicates that *Smith* answered on June 19, 2000. This ap-

pears to be an error.

conversation with Glasser, that Shapiro had paid in full and would not challenge the payoff amount.[4] He faxed Glasser a letter of the same date informing him that he was moving to dismiss the foreclosure action but expressing some puzzlement over why Shapiro had answered in the foreclosure action if he did not intend to challenge the payoff amount.

The following day, June 21, 2000, proved eventful. Glasser faxed a response to Haenn's letter clarifying that it was Shapiro's position that CNB had violated Section 6111 and explaining that Shapiro answered the complaint in order that CNB would have to obtain the state court's approval before the foreclosure action could be dismissed. The letter put Haenn "on notice that Mr. Shapiro [would] be asking the court to order a refund of attorneys fees he paid . . . ." as a condition of that dismissal. (*See* Glasser letter dated June 21, 2000 (Docket # 40, Ex. G).)

After receiving Glasser's letter, Haenn mailed a letter withdrawing his motion to dismiss. It appears that he inadvertently mailed it the Maine District Court in Wicasset, Maine, rather than the court in Rockland, Maine, in which the foreclosure action was pending. Meanwhile, the Rockland court received and granted CNB's motion to dismiss. The foreclosure action was dismissed on June 21, 2000, and remained dismissed.

The next day, Haenn faxed Glasser a letter notifying him that he had withdrawn CNB's motion to dismiss. Meanwhile, the District Court in Wiscasset received the letter withdrawing the motion to dismiss and forwarded the pleading to Rockland. By the time the Rockland court received and docketed Haenn's letter on June 26, the action had already been dismissed for five days.

At this point, a misunderstanding arose that proved critical. Apparently, neither party received notice that the court had granted CNB's motion to dismiss. Thus, both parties believed that Haenn's attempt at withdrawing had been effective and that the foreclosure action continued. Their misapprehension was fueled by the fact that, according to the docket sheet, the court continued to docket pleadings for several months after the case had been dismissed.

Believing that the foreclosure litigation was still pending, Glasser and Haenn engaged in an exchange of increasingly rancorous and antagonistic correspondence over the next few months. Throughout the correspondence, Shapiro continued to demand that CNB refund the attorney fees, but insisted that it retain the rest of the payment and discharge the mortgage and note. In letters dated June 30, July 5 and August 2, 2000, Haenn offered to return Shapiro's payoff. Glasser responded that Shapiro would accept a return of the attorney fees portion but would refuse delivery of the whole amount.

At some point, Haenn proposed a settlement: CNB would dismiss the action and keep the $980.53 in attorney fees, but would waive any fees that had accrued since Shapiro's payment, if Shapiro and Smith would release CNB from all future claims. Shapiro refused. Smith, however, apparently expressed interest in settling.

On October 27, 2000, Haenn moved to amend the foreclosure complaint to remove Smith and her home from the dispute. The amended version complained against Shapiro for defaulting on the note and sought an unspecified amount of attorney fees and costs.

---

4. Shapiro disputes this claim and points to comments indicating that Haenn knew the notation raised the possibility that Shapiro would contest the payoff.

## H. Shapiro's Deposition

Shortly after "withdrawing" the motion to dismiss, Haenn faxed Glasser a letter requesting to depose Shapiro. This provoked a substantial dispute. Glasser protested that there were no relevant facts to be learned in a deposition that Shapiro had not already provided. Haenn maintained that CNB had a right to explore the factual basis for Shapiro's challenge to the attorney fees. Ultimately, the parties agreed that if a deposition was to occur, it would be by telephone.

On October 12, 2000, Haenn deposed Shapiro by telephone and over Shapiro's objection. Haenn had Shapiro identify the loan documents he signed, questioned why he signed them when they plainly indicated a "business" or "commercial" loan, and asked about the uses to which Shapiro had put the land. The deposition lasted fifty minutes.

## I. Termination of the Foreclosure Action and Commencement of This Action

On November 2, 2000, Shapiro moved for summary judgment in the foreclosure action. On November 27, the Maine District Court held a hearing on the motion, at which time the judge informed the parties that the motion was moot because the case had been dismissed five months earlier. This was the first time either party learned that the lawsuit had been dismissed.

Shapiro sued Haenn and CNB in this Court on May 24, 2001, claiming that Haenn's conduct violated the federal Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. 1692 *et seq.*, and the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S.A. § 11001 *et seq;* and that CNB had committed the state torts of wrongful use of civil proceedings and abuse of process.

## III. DISCUSSION

### A. Claims Against Defendant Haenn

■ Plaintiff claims that several of Defendant Haenn's actions in seeking to collect on Plaintiff's loan violated the FDCPA and its counterpart under Maine law. The FDCPA "prohibits 'debt collector[s]' from making false or misleading representations and from engaging in various abusive and unfair practices." *Heintz v. Jenkins,* 514 U.S. 291, 292, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). To merit the statute's protections, Plaintiff must prove that Defendant Haenn was a "debt collector" seeking to collect a "debt" within the relevant definitions.

#### 1. "Debt Collector"

■ The FDCPA defines "debt collector" to include "any person ... who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The definition encompasses attorneys who collect debts on behalf of their clients. *Heintz,* 514 U.S. at 294, 115 S.Ct. 1489. Defendant Haenn represents financial institutions, and ninety-five percent of his practice involves "encouraging people to repay their obligations pursuant to [contracts with the financial institutions]." (*See* Haenn Depo. at 5 (Docket # 37, Haenn Depo.).) Although Defendant Haenn protests that some of that ninety-five percent represents activities other than consumer debt collection (such as commercial litigation, debt restructuring, and bankruptcy), this vague denial is insufficient for a reasonable jury to find that he does not regularly collect or attempt to collect debts. Based on the facts before the Court, Defendant Haenn is subject to the FDCPA's restrictions on collecting "debt."

### 2. Debt for Personal, Family, or Household Purposes

■ "Debt" within the meaning of the FDCPA is "any obligation ... of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes...." 15 U.S.C. § 1692a(5). Thus, the FDCPA " 'applies to consumer debts and not business loans.' " *Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072, 1074 (9th Cir.2001) (quoting *Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1068 (9th Cir.1992)). The character of the debt is determined by the purposes for which it was incurred. *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols et al.*, 214 F.3d 872, 875 (7th Cir.2000).

■ Plaintiff claims he borrowed the funds from Defendant CNB to finance the purchase of land and that he always intended to build his retirement home on that land. It is undisputed that he went on to use the funds to buy the intended parcel and eventually built a home on it. Defendants do not dispute that building a retirement home would be a personal, family, or household purpose. *See Slenk*, 236 F.3d at 1075 (observing that "there could not be a more quintessential personal, family, or household purpose" than building a family home); *Newman v. Boehm, Pearlstein & Bright, Ltd.*, 119 F.3d 477, 481 (7th Cir.1997) ("[T]here can be little doubt that [the purchase of a family home] had a personal, family, or household purpose.")

Instead, Defendants challenge the credibility of Plaintiff's testimony that he originally intended to use the land to build his own residence, rather than for investment purposes. As evidence to the contrary, they point to the documents in the loan file, which Plaintiff signed, that plainly and explicitly identify the loan as a "commercial" or "business" loan.[5] They also note that Plaintiff bought the land in 1993 and held it for roughly five years before beginning construction on his home in 1998 or 1999. In the meantime, he owned and lived in two other residences in Hilton Head and put the lot up for sale at least once. Thus, there is conflicting evidence from which a jury could either believe or disbelieve Plaintiff's claim about the way he originally intended to use the loan proceeds. Consequently, the parties have raised a trialworthy issue about whether Plaintiff's debt was for personal, family, or household purposes and thus entitled to the protections of the FDCPA.

### 3. Nature of Alleged Violations

Although Plaintiff claims that Defendant Haenn violated several provisions of the FDCPA, the alleged violations are of two basic types: those based on inadequate disclosures, and those based on flaws in the foreclosure proceedings.

#### a. Inadequate Disclosures

■ The FDCPA requires a debt collector to disclose in his or her initial oral communication with the consumer "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). In addition, if the first communication is oral, the initial written communication must contain the same notice.

---

**5.** The documents identifying the loan as a "commercial" or "business" loan are relevant to the issue of whether Plaintiff originally intended to use the land for personal, family, or household purposes but are not dispositive of the character of the loan. *Slenk*, 236 F.3d at 1075; *Nix v. Welch & White, P.A.*, No. Civ. A. 00–669–JJF, 2001 WL 826558, *2 (D.Del. 2001) (following *Slenk* ); *see also Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 462 (5th Cir.1999) (holding that loan documents are not dispositive in determining the character of a loan for purposes of the Truth in Lending Act).

*Id.* Defendant Haenn failed to notify Plaintiff that he was attempting to collect a debt, either in their telephone conversation of June 8, 2000, or Defendant Haenn's letter dated June 9, 2000. If the FDCPA governs this debt collection (about which, as discussed above, there is a trialworthy factual issue), and if Defendant Haenn is unable to establish a successful affirmative defense, he is liable to Plaintiff for this violation.

b. Foreclosure Action

 The remainder of Plaintiff's FDCPA claims stem from what he considers improprieties in the foreclosure action.[6] The FDCPA prohibits a debt collector from using or threatening to use debt collection practices that violate state law. *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 448 (8th Cir.2001). When the alleged FDCPA violation is an improper use of state proceedings, liability under the federal statute turns on the propriety of the debt collector's conduct under state law. *See Johnson v. Riddle*, No. 01–4028, 2002 WL 1381233, *6 (10th Cir.2002); *Picht*, 236 F.3d at 448.

Plaintiff argues that the foreclosure action was improper under Maine state law because he was entitled to 30 days' notice and an opportunity to cure his default before Defendant CNB began to foreclose. 14 M.R.S.A. § 6111.[7] Absent the notice, according to Plaintiff, foreclosure was unlawful, and Defendant Haenn violated the provisions of the FDCPA prohibiting a debt collector from threatening to seize or sell property when such action is not authorized by law, 15 U.S.C. § 1692e(4); threatening to take an action that cannot legally be taken, 15 U.S.C. § 1692e(5); using a false representation to attempt to collect a debt, 15 U.S.C. § 1692e(10); and misrepresenting that a document is legal process, 15 U.S.C. § 1692e(13).

Plaintiff also argues that because the attorney fees Defendant Haenn included in the payoff estimate stemmed from the unlawful foreclosure action, Defendants were not actually entitled to those fees. In Plaintiff's view, by including a groundless request for attorney fees in the payoff amount, Defendant Haenn violated the FDCPA by misrepresenting the amount of Plaintiff's debt, 15 U.S.C. § 1692e(2)(A); and misrepresenting the compensation he was personally due, 15 U.S.C. § 1692e(2)(B).

Defendant Haenn admits that he filed the foreclosure action without providing

**6.** Plaintiff also alleges a violation of 15 U.S.C. § 1692e(8), which prohibits, "communicating or threatening to communicate to any person credit information which is known or which should be known to be false." Plaintiff does not link this claim to any facts, and it is not apparent to which facts he intended this claim to refer. Thus, to the extent that it has not been abandoned, the Court grants Defendant Haenn summary judgment on this claim. *See Muniz–Cabrero v. Ruiz*, 23 F.3d 607, 609 (1st Cir.1994) (requiring plaintiffs to state factual and legal reasons why summary judgment should not be granted).

**7. 14 M.R.S.A. § 6111. Notice of mortgagor's right to cure.**

**1. Notice; payment.** With respect to mortgages upon residential property located in this State when the mortgagor is occupying all or a portion of the property as the mortgagor's primary residence and the mortgage secures a loan for personal, family or household use, the mortgagee may not accelerate maturity of the unpaid balance of the obligation or otherwise enforce the mortgage because of a default consisting of the mortgagor's failure to make any required payment ... by any method authorized by this chapter until at least 30 days after the date that written notice is given by the mortgagee to the mortgagor ... that the mortgagor has the right to cure the default by full payment of all amounts that are due without acceleration, including reasonable interest and late charges specified in the mortgage or note as well as reasonable attorney's fees.

advance notice to either Plaintiff or Smith. However, he protests that the requirements of Section 6111 did not apply to this foreclosure action and maintains that filing the foreclosure action was perfectly lawful. He points out that two factors trigger the notice requirement and argues that Plaintiff's mortgage satisfied neither. First, "the mortgagor [must be] occupying all or a portion of the property as the mortgagor's primary residence." 14 M.R.S.A. § 6111. Defendant argues that Plaintiff was the "mortgagor," and because it was Smith, not Plaintiff, who was using the Camden home as her primary residence, no notice was required. Second, the mortgage must "secure[ ] a loan for personal, family or household use." *Id.*

As discussed above, there is a genuine issue of material fact about whether Plaintiff's loan was for personal, family or household use. Resolving the parties' alternative arguments about whether Smith was a mortgagor would require the Court to parse the language of a Maine state statute with little direction from caselaw, which the Court is reluctant to do unnecessarily. Here, however, Defendant Haenn has raised an affirmative defense, and if he prevails, it will be unnecessary to determine whether the failure of notice in the foreclosure action in fact violated Maine law. For purposes of analyzing the affirmative defense, and to avoid making an unnecessary pronouncement about Maine state law, the Court will assume, in Plaintiff's favor, that the FDCPA governs Plaintiff's loan, that Maine law required notice prior to foreclosure and that Defendant Haenn therefore violated the FCDPA.

### 4. Bona Fide Error Defense

Defendant Haenn claims that even if he did violate the FDCPA, the source of all the alleged violations—both the failure to include the required notices in his communications to Plaintiff and his failure to notify Plaintiff before filing the foreclosure action—was his determination that Plaintiff's loan was a commercial debt. If he determined incorrectly, he argues, he is nevertheless exempt from liability under the bona fide error exception to the FDCPA. 15 U.S.C. 1692k(c).

### a. Motion to Strike

■■■■■■ As a preliminary matter, the Court must address Plaintiff's motion to strike, in which he argues that Defendant Haenn waived the bona fide error defense by failing to raise it in his answer. "Generally speaking, a party must set forth all affirmative defenses in the pleadings, on pain of possible forfeiture." *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir.1995), *abrogated on other grounds by Carpenters Local Union No. 26 v. U.S. Fidelity Guar. Co.*, 215 F.3d 136 (1st Cir. 2000); Fed.R.Civ.P. 8(c). However, the rationale behind the rule is to "give the court and the other parties fair warning that a particular line of defense will be pursued." *Id.* "Where ... a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it," the Court may excuse the failure to plead it earlier. *Id.*

■■■ In this instance, the parties had already engaged in six months of litigation in state court in which a central issue was whether Plaintiff's debt was consumer or commercial for purposes of Section 6111. Defendants' position in the earlier litigation was that Plaintiff's obligation was a commercial debt. The discovery in the instant action included extensive inquiry into the underlying character of the loan, the loan documentation, and the basis upon which Defendant Haenn concluded it was a commercial debt. Plaintiff clearly could have anticipated—and apparently did anticipate—that Defendant Haenn's belief

about the nature of the loan would be an important issue in this action. Thus, because it does not appear that Plaintiff has been prejudiced by Defendant Haenn's raising the bona fide error defense for the first time on summary judgment, the Court will consider the defense.

b. Merits of Defense

The FDCPA provides an affirmative defense for debt collectors who can prove, by a preponderance of the evidence, that "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). In applying the bona fide error defense, the Courts of Appeals have distinguished between "clerical errors" and "errors of law." *See, e.g., Baker v. G.C. Servs. Corp.,* 677 F.2d 775, 779 (9th Cir.1982). Although Defendant Haenn's decision to treat Plaintiff's loan as a commercial debt does not fall neatly into either category, to the extent that he erred, his decision was more akin to an error in legal judgment than a purely clerical error.[8]

The Courts of Appeals have split on whether the bona fide error defense is available for errors of law. *Compare Picht,* 236 F.3d at 451 (bona fide error defense is limited to clerical errors); *Smith v. Transworld Sys., Inc.,* 953 F.2d 1025, 1034 (6th Cir.1992) (Krupansky, J., concurring in part and dissenting in part) (same); *Pipiles v. Credit Bureau of Lockport, Inc.,* 886 F.2d 22, 27 (2d Cir.1989) (same); *Baker,* 677 F.2d at 779 *with John-*

*son,* 2002 WL 1381233, at *10–11 (bona fide error defense is available for mistaken legal judgment); *Jenkins v. Heintz,* 124 F.3d 824, 833 (7th Cir.1997) (attorneys are entitled to raise bona fide error defense just as other debt collectors). The First Circuit has not weighed in on the debate.

The Court is persuaded, however, by the Tenth Circuit's reasoning in *Johnson v. Riddle,* and joins a "growing minority" of courts reaching the conclusion that the bona fide error defense is not restricted to clerical errors. *Johnson,* 2002 WL 1381233, at *9. Attorney debt collectors may raise the bona fide error defense based on errors in legal judgment. *See, e.g., id.* at *10. To prevail on the defense, an attorney, like any debt collector, must prove by a preponderance of the evidence that the violation of the FDCPA (1) was unintentional, (2) resulted from a bona fide error, and (3) occurred in spite of procedures "reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).

It is undisputed that Defendant Haenn read Defendant CNB's loan file and concluded in good faith that it described a commercial loan. Several documents in the file identified the loan as a "commercial" or "business" loan, and Plaintiff has identified no document that would have alerted Defendant Haenn it was a consumer loan. Thus, there is no evidence from which a jury could find that Defendant Haenn's error was anything other than bona fide or that any resulting violation of the FDCPA was intentional.

8. It is not clear to the Court that Defendant Haenn "erred" in any respect. He relied on Defendant CNB's determination, clearly recorded in its loan documents, that Plaintiff's debt was a "commercial" or "business" loan. If it was not, it appears that it was Defendant CNB's error, not Defendant Haenn's. Because the FDCPA is a strict liability statute, however, *see Picht,* 236 F.3d at 451, debt collectors are liable if they perform any intentional act that results in a violation, regardless of fault. In order to escape liability, a debt collector must establish a *lack* of fault as an affirmative defense. Thus, although the Court hesitates to label Defendant Haenn's reliance on the bank documents an "error," it feels constrained to analyze his conduct within the rubric of the bona fide error defense.

As to his procedures, Defendant Haenn produced evidence that he is a solo practitioner who personally reviews all the documents in loan collection matters to determine whether the loan is commercial or consumer in character. He further contends that he followed his usual procedure in this case.

Plaintiff counters that Defendant Haenn's procedure was not reasonably calculated to avoid errors in loan classification because he should not have relied on Defendant CNB's conclusion that the loan was a commercial loan. Rather, he was required to make an independent inquiry into the loan's purpose. However, debt collectors may rely on the information their clients provide, and the FDCPA does not require them to conduct their own investigation into the amount or validity of the underlying loan. *See Jenkins,* 124 F.3d at 833–34; *Smith,* 953 F.2d at 1032; *Edwards v. McCormick,* 136 F.Supp.2d 795, 804 (S.D.Ohio 2001). Moreover, in this case, further inquiry would have been futile. If Defendant Haenn had contacted Defendant CNB for more information about the loan, he would have learned that Frohock, who was the bank officer handling Plaintiff's loan at the time of collection, knew no more than what the loan documents reflected and himself believed Plaintiff's loan was a commercial loan.

Defendant Haenn was entitled to rely on the loan documents provided by his client in determining the character of Plaintiff's loan. His standard procedure of reviewing loan documents personally and applying his legal experience and training with an eye to distinguishing the type of loan was reasonably calculated to avoid a loan classification error. Thus, because Defendant Haenn has produced evidence that satisfies all three elements of his bona fide error defense, and Plaintiff has failed to raise evidence from which a reasonable jury could find to the contrary, Defendant Haenn is entitled to summary judgment on Plaintiff's FDCPA claims.

### 5. State Fair Debt Collection Claims

The Complaint also alleges that Defendant Haenn violated several provisions of the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S.A. § 11001 *et seq.* However, the parties did not brief the MFDCPA claim at all, presumably because the language of the state statute tracks that of the federal statute almost exactly. In order to survive summary judgment on this count, Plaintiff was required to inform the Court "of the reasons, legal or factual, why summary judgment should not be entered." *Muniz–Cabrero v. Ruiz,* 23 F.3d 607, 609 (1st Cir.1994). Having failed to do so, Plaintiff has waived any argument that Defendant Haenn's liability under the MFDCPA differs from his liability under the federal statute, and Defendant Haenn is entitled to summary judgment on this claim as well.

### B. Claims Against Defendant CNB

In addition to his federal claim against Defendant Haenn, Plaintiff also alleges two state torts against Defendant CNB. The Court has supplemental jurisdiction over Plaintiff's tort claims because they "are so related to the claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Because it has entered summary judgment against Plaintiff on his only federal claim, however, the Court may decline to exercise jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3).

 In deciding whether to exercise jurisdiction, the Court must consider the values of judicial economy, convenience, fairness and comity. *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108

S.Ct. 614, 98 L.Ed.2d 720 (1988)). Here, all four factors weigh in favor of reaching the merits of Plaintiff's tort claims. Because it is late in the litigation, and the parties have engaged in substantial discovery to develop both the federal and state law claims, it would advance the values of judicial economy and convenience for the Court to address the state law claims instead of forcing Plaintiff to refile them in state court. *See Tomaiolo v. Mallinoff,* 281 F.3d 1, 11 (1st Cir.2002). Furthermore, it does not appear unfair to resolve the state claims in this forum since both parties have briefed them thoroughly, and neither has objected to this Court's jurisdiction. Finally, the Court can resolve the claims based on straightforward and settled Maine law, which minimizes comity concerns. *See Rodriguez,* 57 F.3d at 1177. The Court thus will exercise its supplemental jurisdiction and reach the merits of Plaintiff's state law claims.

### 1. Wrongful Use of Civil Proceedings

█ Plaintiff proposes three theories under which Defendant CNB is liable for wrongful use of civil proceedings: that it initiated the foreclosure without probable cause, that it continued the action after Plaintiff tendered payment, and that it continued the foreclosure after having waived the right to foreclose. A party is liable for wrongful use of civil proceedings under Maine law where "(1) [it] initiates, continues or procures civil proceedings without probable cause, (2) with a primary purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based, and (3) the proceedings have terminated in favor of the person against whom they are brought." *Pepperell Trust Co. v. Mountain Heir Fin. Corp.,* 708 A.2d 651, 656 (Me.1998).

█ The first and third elements of the tort present questions of law for the Court to decide. *Id.* (noting that whether prior proceedings terminated in the plaintiff's favor is an issue of law); *Price v. Patterson,* 606 A.2d 783, 785–86 (Me.1992) (observing that whether facts amounted to probable cause is an issue of law). The second element requires a more fact-intensive inquiry into Defendant CNB's motives—a type of inquiry that is often better suited to resolution by a jury. Thus, the Court will simply assume in Plaintiff's favor that Defendant CNB's "primary purpose" was something other than the proper adjudication of the foreclosure action and will consider whether Plaintiff has established the first and third elements of his claim as a matter of law, under any of his three theories.

#### a. Initiating Foreclosure Action

█ Plaintiff first contends that Defendant CNB initiated the foreclosure action without probable cause. It is undisputed that as of June 6, 2000, when Defendant CNB started the foreclosure proceedings, Defendant CNB knew that Plaintiff had defaulted on his final payment under the note and that the note was secured by the residence in Camden. At the most basic level, therefore, Defendant CNB had probable cause to initiate a foreclosure action.

Plaintiff seeks to refocus the probable cause inquiry, however, by arguing that once Defendant CNB failed to provide him the notice required under 14 M.R.S.A. 6111, it no longer had probable cause to initiate the foreclosure. As a preliminary matter, the Court is not convinced that the failure to follow a procedural requirement negates probable cause. More importantly, however, Defendant CNB claims it initiated the foreclosure action based on the plausible legal position that Section 6111 did not govern, both because Plaintiff's loan was a commercial loan and because Plaintiff did not live in the mortgaged

property as his primary residence. Thus, the undisputed evidence indicates that Defendant CNB took a plausible legal position and had probable cause to commence the foreclosure.

Moreover, Plaintiff has failed to establish the tort's third element under this theory because the proceedings terminated in Defendant CNB's favor. In some circumstances, a plaintiff's voluntary withdrawal of his claims is a termination favorable to the defendant. *See Howison v. Morgan*, No. CIV.A. CV–99–094, 2000 WL 33676156, *1 (Me.Super. Jan. 3, 2000) (citing *Pepperell Trust*, 708 A.2d at 656). However, a voluntary dismissal *following settlement* is not a favorable termination. *See Marks v. Gray*, 42 Me. 86 (Me.1856) (holding that settlement in the prior proceedings estops a later malicious prosecution action); *see also Jaress & Leong v. Burt*, 150 F.Supp.2d 1058, 1063 (D.Haw. 2001) ("It is a well-accepted exception to the general rule that a dismissal resulting from a settlement does not constitute a favorable termination for malicious prosecution purposes."); *Mills County State Bank v. Roure*, 291 N.W.2d 1, 4 (Iowa 1980) (holding that dismissal after payment in full cannot form the basis of a malicious prosecution claim). Because the court granted Defendant CNB's motion to dismiss based on Plaintiff's full payment of the disputed debt, Plaintiff did not receive a favorable termination on the initial stage of the foreclosure proceedings.

b. Continuing Foreclosure Action After Plaintiff Tendered Payment

 Even if Defendant CNB did not wrongfully abuse civil proceedings by initiating the foreclosure suit, Plaintiff argues that it did so by continuing the lawsuit after Plaintiff had already paid the full amount owed.[9] As to the first element under this theory, Defendant CNB denies that it continued the litigation without probable cause and argues that it was actually *Plaintiff* who continued the proceedings by trying to reclaim the attorney fees. In Defendant CNB's view, it simply took a defensive position to preserve the fees. Plaintiff responds that his answer in the foreclosure action was merely an affirmative defense, not a counterclaim; therefore, Defendant CNB remained on the offensive and drove the continuation of the litigation.

The documentary evidence strongly favors Defendant CNB's characterization. Plaintiff's answer asks that "the attorneys fees and costs charged to [Plaintiff] by [Defendant CNB] . . . be declared excessive and ordered returned to [Plaintiff]." (*See* Answer (Docket # 37, Ex. 3).) Furthermore, Glasser's June 21 letter, which Defendant Haenn received just before attempting to withdraw the voluntary dismissal, explained that Plaintiff wished to have the court decide the appropriateness of the attorney fees before approving Defendant CNB's voluntary dismissal. It further advised Defendant Haenn to be "on notice that Mr. Shapiro [would] be asking the court to order a refund of attorneys fees he paid. . . ." (*See* Glasser letter dated June 21, 2000 (Docket # 40, Ex. G).)

The best evidence supporting Plaintiff's characterization that he was not seeking to

---

9. The wrinkle in this analysis is that after the state court granted Plaintiff's motion to dismiss, there technically *were* no more civil proceedings. However, it appears from the undisputed facts that neither party received notice of the dismissal, and both parties believed in good faith that the litigation continued. Furthermore, the state court continued to docket pleadings for several months after the dismissal. Because both parties and the court acted as though the case continued after June 21, 2000, for purposes of the wrongful use of civil proceedings analysis, the Court will treat the dismissal as ineffective.

reclaim the attorney fees via the foreclosure action comes from two documents: a letter to Defendant Haenn, dated September 13, 2000, and Plaintiff's motion for summary judgment in the foreclosure action, dated November 2, 2000. In each, Plaintiff proposed that the mortgage be discharged and that he bring a separate action to recover the attorney fees. However, evidence that this was Plaintiff's position as of September or November does not establish who was responsible for perpetuating the lawsuit the preceding June. The evidence of the parties' positions *at the time Defendant CNB attempted to withdraw its motion to dismiss* strongly suggests that it was Plaintiff who was the driving force behind prolonging the foreclosure action.

However, even if it was Defendant CNB that perpetuated the litigation by seeking to withdraw its motion to dismiss, it had probable cause to do so. Probable cause must be assessed based on what Defendant CNB knew when it opted to go forward with foreclosure. The letters and pleadings Defendant CNB received from Plaintiff in June 2000 clearly gave the impression that Plaintiff intended to seek recovery of the attorney fees through the foreclosure action, and the Court does not believe that a reasonable jury could read them otherwise. Thus, to the extent that it was Defendant CNB that continued the litigation after June 16, 2000, it had probable cause to do so in order to litigate the fees issue.

As to the third element, the Court's conclusion above that the initial proceedings did not terminate in Plaintiff's favor is not determinative of whether the *continued* proceedings terminated in his favor; this theory requires a slightly different analysis. The initial stage of the litigation ended in a dismissal in June 2000. Thereafter, the parties entered a second stage, which terminated in November. To determine whether the second phase terminated in Plaintiff's favor, the Court must consider Plaintiff's position during this second phase and whether the ultimate resolution vindicated that position.[10] The summary judgment record makes clear that the major issue the parties litigated after June 21 was refunding the attorney fees. The state court never addressed this issue but simply found that the action had been dismissed months earlier. Thus, Plaintiff's claim to the attorney fees was never vindicated and as a matter of law, the continued proceedings did not terminate in his favor.

c. Continuing Foreclosure Action After Defendant CNB Waived Foreclosure

▮▮▮▮ Plaintiff's third theory of liability is that by statute, Defendant CNB waived the right to foreclose on July 1, 2000, and it lacked probable cause to continue the litigation after that date. Under Maine law, if a mortgagee accepts payment in satisfaction of a debt after the commencement of a foreclosure action and does not return the payment within ten days, it waives the right to foreclose. 14 M.R.S.A. § 6204.[11] At the latest, Defen-

---

10. An example is useful to demonstrate why this is the proper analysis. If, for example, Defendant CNB had continued the proceedings after June 21, 2000, when no disputed issue remained, and Plaintiff had argued to the state court that the continued litigation was improper because the action had already been dismissed, then the court's ultimate determination in November that the action in fact *had* already been dismissed would have

been favorable to Plaintiff. It was based on this possibility, which this Court could not rule out based on the pleadings alone, that it denied Defendant CNB's earlier motion for judgment on the pleadings in the instant action.

11. **14 M.R.S.A. § 6204. Redemption in one year.**

dant CNB learned on June 21, 2000, that Plaintiff intended to contest the attorney fees portion of the payoff. Therefore, Plaintiff argues, when it failed to return the money by July 1, 2000, it waived its right to foreclose, and it lacked probable cause to pursue any foreclosure proceedings after this date.

However, the undisputed evidence indicates that any delay in returning the funds was occasioned by Plaintiff's conduct and did not reflect that Defendant CNB intended to accept partial payment and waive foreclosure. Glasser admits that he selected his words carefully when he delivered the check. The Court finds that the words he chose were ambiguous about whether Plaintiff would challenge the payoff. Thus, when Defendant CNB accepted the payment, it reasonably treated it as a complete satisfaction of the debt and properly sought to end the foreclosure action.

It was only when Glasser clarified on June 21 that Plaintiff would seek the return of the attorney fees that Defendant CNB sought to reassert its foreclosure rights. Nine days later, in correspondence dated June 30, 2000, Defendant CNB indicated that it intended to return the funds. When Plaintiff acknowledged this offer in early August, he flatly rejected it, and Glasser even threatened an action for criminal trespass if Defendant Haenn entered his office in an attempt to return the money. Even construing these facts in Plaintiff's favor, there is insufficient evidence for a jury to conclude that Defendant CNB intended to accept the check as partial payment and then declined to return the funds. At the very least, Plaintiff's actions generated enough confusion

that Defendant CNB had probable cause to believe it retained its right to foreclose.

Thus, Plaintiff did not establish that Defendant CNB lacked probable cause to continue with the foreclosure after July 1 and, as discussed above, the continued litigation did not terminate in his favor. Plaintiff has failed to prove either the first or third element of any of his three theories of wrongful use of civil proceedings, and Defendant CNB is entitled to summary judgment on this claim.

## 2. Abuse of Process

In contrast to a wrongful use of civil proceedings claim, an abuse of process claim focuses not on the legitimacy of an entire lawsuit but rather on the improper use of individual legal procedures. *Simon v. Navon,* 71 F.3d 9, 15 (1st Cir.1995) (applying Maine law). Thus, even though the foreclosure action was not wrongfully instituted, Plaintiff nevertheless could make out an abuse of process claim if he could prove that Defendant CNB wielded legal process abusively in the course of prosecuting the foreclosure. The two basic elements of an abuse of process claim are "a bad motive, and the use of a legal process for an improper, collateral objective." *Id.* (citing *Nadeau v. State,* 395 A.2d 107, 117 (Me.1978)). Evidence of bad motive alone is insufficient: "although wrongful motive in the context of abuse of process claim may be inferred from an improper act, the reverse is not true." *Id.* at 16. Plaintiff points to two legal procedures it claims Defendant CNB abused: deposing Plaintiff and amending its complaint.

... The acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of any mortgage of real property, of anything of value to be applied on or to the mortgage indebtedness by the mortgagee ... constitutes a waiver of the foreclosure ... unless the bank returns the payment to the mortgagor within 10 days of receipt.

As to the deposition, Plaintiff argues that both elements of abuse of process are satisfied by reasonable inferences from one fact: Defendant Haenn deposed Plaintiff even though he already had all the information he intended to seek in the deposition. Plaintiff posits that Defendant CNB's ulterior motives for the deposition were to harass Plaintiff and bully him into settling the foreclosure suit and relinquishing his claim for a refund of the attorney fees.

The deposition transcript indicates that Defendant Haenn asked questions designed to explore why Plaintiff was claiming that the loan was a consumer debt subject to the notice requirement of Section 6111. He asked about the use to which Plaintiff had put the property, whether he had signed the loan documents, and why he had signed documents indicating that the loan was for "business" purposes if, in fact, it was not.

Although Plaintiff correctly observes that the deposition proved rather fruitless and duplicated much of the evidence already in the CNB loan file and correspondence between counsel, it was nevertheless targeted to the remaining issues in the litigation and appears to have been calculated to gain some admission from Plaintiff that might have proved useful to Defendant CNB. Deposing a party to explore the factual basis for his defenses is certainly a proper use of legal procedures. *See Rosen v. Am. Bank of Rolla*, 426 Pa.Super. 376, 627 A.2d 190, 193–94 (1993) (dismissing an abuse of process claim where complaint indicated that defendant subpoenaed a witness who clearly had information relevant to the lawsuit). Moreover, the deposition lasted only fifty minutes, and the parties conducted it by telephone, which undercuts the claim that it was intended to be harassing. *But see Givens v. Mullikin*, 75 S.W.3d 383, 402–03 (Tenn.2002) (finding that plaintiff who was subjected to 230 interrogatories and eight-hour deposition not calculated to lead to the discovery of new information stated a claim for abuse of process). Defendant CNB used the deposition for the purpose for which it was intended. Even if it also hoped to harass and bully Plaintiff, as Plaintiff suspects, bad motive alone does not establish abuse of process. *See Simon*, 71 F.3d at 16 ("[A] showing of bad motive in connection with 'regular' process is not enough.")

Plaintiff also points to the amended complaint as an abusive procedure. The amended complaint, which seeks to convert the foreclosure action against Smith and Shapiro into an action on the note against Shapiro alone, seems an entirely proper response to the fact that Smith and Defendant CNB had reached a settlement agreement. In fact, it appears to have had little or nothing to do with Plaintiff. Thus, Defendant CNB is also entitled to summary judgment on this abuse of process theory.

### 3. Punitive Damages

The Complaint lists "punitive damages" as a separate count against Defendant CNB. Because Defendant CNB is entitled to summary judgment on both of Plaintiff's tort claims, Plaintiff is not entitled to any damages from Defendant CNB, much less punitive damages. Defendant CNB is entitled to summary judgment on this Count as well.

### 4. Declaratory Judgment

Finally, Plaintiff requests declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57. He asks the Court to order Defendant CNB to discharge the mortgage and Plaintiff's obligation under the note, and to report the loan as fully paid to any credit agency to which it has been or may be reported. Although it appears from the summary judgment record that Plaintiff

**50**

has paid the note in its entirety and that Defendant CNB continues to possess those funds, the Court declines to order the requested relief. Declaratory judgment pursuant to 28 U.S.C. § 2201 is not an independent claim but an alternative form of relief. *Akins v. Penobscot Nation,* 130 F.3d 482, 490 n. 9 (1st Cir.1997). Having granted summary judgment for Defendant CNB on all of Plaintiff's substantive claims, there is no basis for the requested declaratory relief.

## IV. CONCLUSION

For the above reasons, the Court DENIES Plaintiff's Motion to Strike (Docket # 31) and DENIES Plaintiff's Motion for Partial Summary Judgment (Docket # 36). The Court further GRANTS Defendant Haenn's Motion for Summary Judgment (Docket # 25) and ORDERS judgment in his favor on Counts I and II. It GRANTS Defendants Camden National Bank and Camden National Corporation's Motion for Summary Judgment (Docket # 33) and ORDERS judgment in their favor on Counts III, IV, V, and VI.

SO ORDERED.