**Michael D. CAPUTO, Plaintiff,**

v.

**PROFESSIONAL RECOVERY SERVICES, INC., and John Santos, Defendants.**

**No. 00–4208–SAC.**

United States District Court, D. Kansas.

April 21, 2003.

---

9. *Sierra*, 258 F.3d at 1218.

10. *Mezei*, 345 U.S. at 212, 73 S.Ct. 625.

11. *Hoyte–Mesa*, 272 F.3d at 992.

James C. Heathman, Topeka, KS, Frederick W. Schwinn, Consumer Law Center, P.A., Livermore, CA, for Plaintiff.

Susan L. Mauch, Cosgrove, Webb & Oman, Topeka, KS, Adam L Plotkin, Denver, CO, Adam L. Plotkin, Denver, CO, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' motion for summary judgment on plaintiff's claims under the Fair Debt Collection Practices Act, fraud and outrage and partial summary judgment on plaintiff's claims on unconscionable business practices and entitlement to an enhanced penalty under the Kansas Consumer Protection Act (Dk.87); the plaintiff's motion for partial summary judgment to bar the defendant from presenting a bona fide error defense pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692(k) (Dk.91); and the plaintiff's motion for partial summary judgment to have the court declare him a "disabled person" as defined under the Kansas Consumer Protection Act, K.S.A.2000 Supp. § 50–676(b) (Dk.93). The parties having filed their respective memoranda in support, in response and in reply, the matter is ready for decision.

The plaintiff Michael D. Caputo filed this action against the defendant John P. Marzulli, a debt collector, and the defendant Professional Recovery Services, Inc. ("PRS"), the collection agency employing Marzulli, alleging the defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692; violated the Kansas Consumer Protection Act, K.S.A. 50–623; and committed the state law torts of fraud and outrage. These claims arise entirely from one telephone message and four subsequent telephone conversations occurring in January and February of 2000. These calls were made concerning the defendants' efforts to collect on a credit card debt incurred by Caputo when he purchased a Honda tractor mower sometime before 1996.

Before addressing the substance of the motions, the court must comment on the briefs and exhibits that have been submitted. This case consists principally of what was said in a telephone message and four subsequent collection calls, all of which were tape recorded and have been transcribed, reproduced, and submitted as exhibits. Neither side advances any challenge to the accuracy of the recordings, and both sides apparently agree the actual recordings are the best evidence of what was said. This case is unusual in that the most critical facts involved in the litigation are essentially undisputed. Nor is the relevant law governing these claims particularly complex or unsettled. In such circumstances, one would expect the parties to submit concise memorandum that focus on narrow legal issues appropriately suited to summary judgment proceedings. What the court has received is a stack of briefs and exhibits almost eclipsing nine inches. The briefs are anything but concise and focused.[1] They are rambling, repetitive,

---

1. For example, the defendants' statement of uncontroverted facts in support their motion for summary judgment is 24 pages in length and consists of 118 paragraphs. The plaintiff matched and exceeded this excessive briefing by controverting many of the 118 paragraphs with his own statement that includes numerous sub-paragraphs and that totals 78 pages.

and replete with argumentative, if not somewhat misleading, characterizations of what was said in those recorded conversations.[2] This chosen manner for briefing the issues has placed an unnecessary demand on the court's time and resources. To conserve its efforts, the court will suspend its normal practice of addressing each tendered paragraph in the parties' statements of fact and simply summarize the more important uncontroverted facts in its discussion of the respective claims.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will … preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the evidence of record and draw all reasonable inferences in the light most favorable to the nonmovant. *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir.1998). (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995). "It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir. 1995). The nonmovant's burden is more than a simple showing of "some metaphysi-

---

2. For example, the defendants assert a bona fide error defense that is largely based on this proposition found in their memorandum of thirty-eight pages:

 "Listening to the tapes of the conversations between Caputo and Marzulli, Russo and Miller leads the listener to an obvious conclusion: the wrong 'impressions' Caputo claims to have received are at most fabri-

cated simply to generate the present suit, and at a minimum are completely irrational."

(Dk.88, p. 6). The defendants do not specify what they consider to be Caputo's wrong, fabricated and completely irrational impressions. Sweeping conclusions supported by little more than rhetoric are not the proper substance of summary judgment motions.

cal doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Vasquez v. Ybarra*, 150 F.Supp.2d 1157, 1160 (D.Kan.2001) (citing *See Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir.1996) (applying local rules of District of Utah)); see also D.Kan. Rule 56.1(b)(1).

## FAIR DEBT COLLECTION PRACTICES—BONA FIDE ERROR

■ As appearing in the pretrial order, the plaintiff generally alleges that the defendants "threatened to have Plaintiff prosecuted criminally for not paying the alleged debt, threatened to tell all his other creditors unless he paid the debt, and made numerous misrepresentations about the legal status of the debt." (Dk.83, p. 5). Later in the pretrial order, under his theory of the Fair Debt Collection Practices Act ("FDCPA"), the plaintiff identified numerous issues of fact to be resolved at trial, specifically whether the defendant: engaged in conduct and used language the natural consequence of which was to harass, oppress or abuse the plaintiff in violation of 15 U.S.C. § 1692d(2); used any false, deceptive, or misleading misrepresentation or means in connection with the collection of a debt, including false representations of the character, amount or legal status of the alleged debt in violation of 15 U.S.C. § 1692e(2)(A); made false representations of any compensation which may be lawfully received by any debt collector for the collection of a debt in violation of 15 U.S.C. § 1692e(2)(B); made false representations or implications that any individual is an attorney or that any communication is from an attorney in violation of 15 U.S.C. § 1692e(3); made representations or implications that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person in violation of 15 U.S.C. § 1692e(4); threatened to take any action that cannot legally be taken or that is not intended to be taken in violation of 15 U.S.C. § 1692e(5); made false representations or implications that the plaintiff committed any crime or other conduct in order to disgrace the consumer in violation of 15 U.S.C. § 1692e(7); communicated or threatened to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed in violation of 15 U.S.C. § 1692e(8); made false representation or used deceptive means to collect or attempt to collect any debt or to obtain information concerning the plaintiff in violation of 15 U.S.C. § 1692e(10); and failed to cease collection of the alleged debt after it was notified by the plaintiff that disputed the alleged debt in violation of 15 U.S.C. § 1692g(b).

Missing from the pretrial order is the plaintiff's identification of which statements in the recorded conversations correspond to which alleged violation of the FDCPA. *See Bieber v. Associated Collection Services, Inc.*, 631 F.Supp. 1410, 1413–14 (D.Kan.1986). Without such an effort, the issues of fact remain mere restatements of the statutory provisions and the court is unable to add any focused structure to the parties' broad summary judgment filings. Thus, as demonstrated hereafter, the court cannot conduct the necessary analysis to decide the summary judgment issues presented under this theory.

■ "Congress enacted the Fair Debt Collection Practices Act in order to stop 'the use of abusive, deceptive and unfair debt collection practices by many debt collectors.'" *Freyermuth v. Credit Bureau*

*Services, Inc.*, 248 F.3d 767, 771 (8th Cir. 2001) (quoting 15 U.S.C. § 1692(a)). The FDCPA groups impermissible practices under such categories as harassing, oppressive or abusive conduct, 15 U.S.C. § 1692d; false, deceptive or misleading representations or means, 15 U.S.C. § 1692e; and unfair or unconscionable collection methods, 15 U.S.C. § 1692f. *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir.2002). The FDCPA also requires the debt collector to provide written notice concerning the debt and mandates the debt collector to suspend collection efforts when the consumer timely disputes the debt until verification of the debt is obtained and a copy of it is sent to the consumer. 16 U.S.C. § 1692g. The list of practices within the ban of § 1692e is non-exhaustive, and a debt collection practice may violate the FDCPA even if not named within a specific subsection. *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2nd Cir.1993). The analysis of such claims "focuses on the debt collector's actions and whether an unsophisticated consumer would be harassed, misled or deceived by them." *Freyermuth v. Credit Bureau Services, Inc.*, 248 F.3d at 771. A debt collector's civil liability arises from the single violation of any FDCPA provision. 15 U.S.C. § 1692k(a); *see also Bentley*, 6 F.3d at 62.

The FDCPA provides an affirmative bona fide error defense to debt collectors:

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). Therefore, for this defense to prevail on summary judgment, the defendants must prove for each and every alleged violation (1) that it was unin-

tentional, (2) that it was a bona fide error, and (3) that it was "made despite 'the maintenance of procedures reasonably adapted to avoid' the violation." *Johnson v. Riddle*, 305 F.3d at 1121; *see Hartman v. Meridian Financial Services, Inc.*, 191 F.Supp.2d 1031, 1045 (W.D.Wis.2002). Following the lead of the Seventh Circuit, the Tenth Circuit in *Johnson v. Riddle* held that the bona fide error defense is available for mistakes of law and is not limited to clerical errors. 305 F.3d at 1123–24.

As to what makes a violation intentional, whether it is simply the intent to act or whether it is the specific intent to violate the Act, the court has not found a controlling Tenth Circuit decision, and the case law from other leading jurisdictions is somewhat unsettled. In *Johnson*, the Tenth Circuit quoted and relied upon the following excerpt on the bona fide error defense taken from the Senate Report: " 'A debt collector has no liability, however, if he violates the act *in any manner, including with regard to the act's coverage*, when such violation is unintentional and occurred despite procedures designed to avoid such violations.' S.Rep. No. 95–382, at 5." 305 F.3d at 1123. This quote is certainly more consistent with a specific intent to violate the Act.

The Sixth Circuit addressed this defense in the situation where a debt collector made a telephone call in violation of 15 U.S.C. § 1692c because the debtor's account had been erroneously coded as new even though there had been previous collection efforts which had ceased after the debtor sent a letter in accordance with 15 U.S.C. § 1692c. *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 401 (6th Cir. 1998). The Sixth Circuit found that the debt collector had established the requirements of this defense:

Contrary to Lewis's claim that the ACB agent's July 8th telephone call demonstrates ACB's intent to resume collection efforts, in fact it shows that the only reason ACB's agent contracted Lewis was because he believed that Lewis's account was new. This is simply not enough to show that ACB intended to resume collection efforts in violation of the FDCPA. Inherent in Lewis's argument is a flawed understanding of the intent requirement of § 1692k(c). The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional. To hold otherwise would effectively negate the bona fide error defense.

*Lewis v. ACB Business Services, Inc.*, 135 F.3d at 401–02. Another court has followed *Lewis* in holding the intent requirement for this defense is that the debtor collector only not intend to violate the FDCPA. *Frye v. Bowman, Heintz. Boscia, Vician, P.C.*, 193 F.Supp.2d 1070, 1088 (S.D.Ind.2002); *But see Shapiro v. Haenn*, 222 F.Supp.2d 29, 43 n. 8 (D.Me.2002) ("Because the FDCPA is a strict liability statute, however, . , ., debt collectors are liable if they perform any intentional act that results in a violation, regardless of fault. In order to escape liability, a debt collector must establish a lack of fault as an affirmative defense." (citation omitted)).

In a case where the debt collector and attorney were found liable under the FDCPA for violations based on the misleading nature of debt collection letters issued under the attorney's name, the Seventh Circuit recently addressed the intent element of the defense in this way:

Assuming, consistent with our observations in *Jenkins*, that a legal mistake can qualify as a bona fide error under the FDCPA, a second question presents itself. Section 1692k(c) requires the debt collector to prove, *inter alia*, that its violation of the FDCPA "was not intentional." In this respect, the bona fide error provisions of TILA and the FDCPA are virtually identical; TILA too requires proof that "the violation was not intentional." 15 U.S.C. § 1640(c). In *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1166–67 (7th Cir.1974), we held that the relevant intent was the defendant's intent to commit the act determined to be a violation of TILA, not an intent to commit a violation of the statute. Thus, so long as the act found to be a violation of TILA is deliberate, the bona fide error defense is unavailable. *Id.* If the same holds true for the FDCPA, the bona fide error defense would likewise be unavailable to Household: Household's actions were not inadvertent; rather, it intended to use Dickerson in the very manner that we have found to violate the FDCPA. *See id.* Whether or not the FDCPA's bona fide error provision should be interpreted in this manner is open to debate, however. The Sixth Circuit has concluded that a debt collector may avoid liability via the bona fide error defense by showing that it did not intend to violate the statute: "The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional." *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 402 (6th Cir.1998). And, as Judge Tinder has pointed out, although the pertinent language of the two statutes is the same, there are other differences between them that may support differing constructions. *See Frye v. Bowman, Heintz, Boscia & Vician, P.C.*, 193 F.Supp.2d 1070, 1087–88 (S.D.Ind.2002). This question, which the parties have not addressed, is not one that we need decide here. We shall again assume that Household may avail itself of the bona fide error defense because it had no intent to violate the

FDCPA, although its actions were deliberate.

What dooms Household's bona fide error defense is that its actions, along with Dickerson's, were in plain contravention of our opinion in *Avila* [*v. Rubin*, 84 F.3d 222 (7th Cir.1996)]. *See, e.g., Hulshizer v. Global Credit Servs., Inc.*, 728 F.2d 1037, 1038 (8th Cir.1984) (per curiam) (finding no basis to invoke the bona fide error defense where "[t]he language of the statute [was] unambiguous and [the creditor's] disregard of that language [was] undisputed"); see also Janet Flaccus, *Fair Debt Collection Practices Act: Lawyers and the Bona Fide Error Defense*, 2001 ARK. L. NOTES 95 (2001) (arguing that the bona fide error defense should be available when the law is unsettled, but not when it is reasonably clear). *Avila*, which was decided nearly a year before Household retained Dickerson, made clear that an attorney must have some professional involvement with the debtor's file in order for the presence of his name on a delinquency not to be misleading. 84 F.3d at 229. Many of the very omissions that we highlighted in *Avila* were present here.... As we discussed earlier, the minor additional steps that Dickerson took to involve himself in the process of preparing and sending the letters were, in Judge Kocoras' words, a mere "veneer" of compliance with the FDCPA. Dickerson's actions complied neither with the spirit nor the letter of *Avila*; no reasonable attorney, and for that matter, no reasonable creditor or debt collector, having read our opinion, could have failed to appreciate this. Whatever steps Dickerson took to familiarize himself with the law, including precedents like *Avila*, obviously were inadequate. Having hired Dickerson, and having itself participated in a process by which delinquency letters were sent to debtors on Dickerson's letterhead with-out his meaningful involvement in the process—indeed, having signed a contract with Dickerson which spelled out that very process (see R. 53, Exhibits in Support of Household's Motion for Summary Judgment, Ex. 4 ¶ 1)—Household cannot avail itself of the bona fide error defense.

*Nielsen v. Dickerson*, 307 F.3d 623, 641–42 (7th Cir.2002). The Seventh Circuit assumed without deciding that the operative intent was to violate the FDCPA and that this intent can be inferred from plain violations of unambiguous FDCPA provisions. Like the Seventh Circuit, the court will not choose between the two possible intents and simply will assume that the defendants need only prove they did not intend to violate the FDCPA. Using this approach, the issue of intent becomes principally a credibility question as to the defendants' subjective intent to violate the Act.

As for whether an error is "bona fide," courts have applied the traditional definition of " 'made in good faith; inadvertently; without fraud or deceit' " and " 'faithfulness to one's duty or obligation.' " *Edwards v. McCormick*, 136 F.Supp.2d 795, 801 n. 8 (S.D.Ohio 2001) (quoting *Black's Law Dictionary* 168) (7th Cir.1999) ("Clearly, an attorney who signs without reading a letter which grossly misstates both the law and his intentions has not acted in good faith."); *see, e.g., Shapiro v. Haenn*, 222 F.Supp.2d 29, 43 (D.Me.2002) (the debt collector read the loan file and "concluded in good faith that it described a commercial loan,"); *Hartman v. Meridian Financial Services, Inc.*, 191 F.Supp.2d 1031, 1045 (W.D.Wis.2002) (the debt collector asserted its "good faith belief" that it was an in-house collection department). In effect, this component serves to impose an objective standard of reasonableness upon the asserted unintentional violation. The court here considers, in part,

whether a reasonable debt collector in the defendant's position would have appreciated that such conduct would be in violation of the Act.

Looking at several cases which have applied the bona fide error defense helps to understand its probable scope and applicability in the instant case. In *Jenkins v. Heintz*, 124 F.3d 824, 832 (7th Cir.1997), *cert. denied*, 523 U.S. 1022, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998), the bona fide error defense permitted a debt collector to rely on the creditor's representations without further investigation that all charges were authorized under the contract. The defense protected a debt collector's "misstatement" on the percentage of wages that could be garnished, as the debt collector's employee averred "that if he made such a statement, it was completely unintended and he knew the legal limit on wage garnishment ..., as he had been educated on wage garnishment restrictions" by his employer. *Bieber v. Associated Collection Services, Inc.*, 631 F.Supp. 1410, 1415 (D.Kan.1986). The bona fide error defense, however, did not protect a debt collector who tried to collect a debt under a false name. *Hartman v. Meridian Financial Services, Inc.*, 191 F.Supp.2d 1031, 1045–46 (W.D.Wis.2002) ("[I]f the bona fide error defense were interpreted as broadly as defendant suggests it should be, then every debt collector could avoid the FDCPA by simply asserting that it believed its offending conduct did not violate the Act.")

The defendants contend that all FDCPA violations alleged by the plaintiff were the result of bona fide errors for which there is no recovery. PRS points to its written rules and procedures which it maintains, uses in training its collectors, and then enforces by periodic random monitoring of collectors' telephone calls. The defendants characterize the plaintiff's FDCPA claims as simply his own "wrong impressions" that were "the result of bona fide error" (Dk.88, p. 5) and that were "at most fabricated simply to generate the present suit, and at a minimum are completely irrational," *id.* at 6. Pointing to Marzulli's affidavit, the defendants also contend it is uncontroverted that Marzulli did not intend to violate the FDCPA or the rules and regulations of PRS. "Absent evidence that Marzulli intended to violate the FDCPA, Defendants have satisfied the requirements necessary to prove the bona fide error defense." *Id.* at 7.

The plaintiff responds challenging the adequacy and purpose of the PRS's training program and the extent of the defendant Marzulli's participation in it. The plaintiff attacks the defendants' evidence that it had any program to randomly monitor telephone calls and that it had actually used it. Finally, the plaintiff contends the defendants face "a very difficult time" in proving unintentional bona fide acts in:

> repeatedly making false representations concerning the character, amount, or legal status of the alleged debt, repeatedly threatening to take action that cannot legally be taken or that was not intended to be taken, falsely representing or implying that Mr. Caputo had committed a crime, and repeatedly failing to cease collection of the alleged debt after they were notified by Mr. Caputo that he disputed the alleged debt....

(Dk.106, p. 10).

The plaintiff also seeks summary judgment barring the defendants from asserting the bona fide error defense. The plaintiff argues the defendants are unable to prove that they committed unintentional errors and that they effectively maintained procedures to avoid such errors. The defendants repeat their general arguments advanced in favor of their own motion for summary judgment on this issue. Notably, the defendants contend that it is un-

controverted that Marzulli did not intend to violate the FDCPA, as he was trained on its requirements and tested on the same before making any consumer calls. In his reply brief,[3] the plaintiff argues that to prevail on his motion he "need only negate one of the elements of the bona fide error defense" and then follows up with:

> In this case, the Plaintiff can show that the Defendants made at least one intentional business decision which directly violated the FDCPA. A good example of the Defendants intentional-not unintentional-business decisions to violate the FDCPA is the Defendants' decision to continue collecting the alleged debt from the Plaintiff in this case after he had requested a verification of the debt.

(Dk.109, p. 23).

To be entitled to summary judgment by reason of this defense, the defendants must establish a bona fide error for each and every alleged violation of the FDCPA. To be entitled to partial summary judgment against this defense, the plaintiff must establish that there was no bona fide error for each and every alleged violation of the FDCPA. The parties have failed to carry their respective burdens. Neither side has briefed this issue and made use of any comprehensive listing of the specific recorded statements that correspond with the general allegations of statutory violations.[4] Nor have they focused their evidence on training and the arguments on reasonableness to the specific recorded statements. Instead, both sides randomly pick different recorded statements and generally argue the lack of intent or the presence of intent. Essentially, both sides assume that the presence or absence of intent as to one violation necessarily decides the issue of intent as to another violation. The parties cite no authority for this assumption which frankly seems illogical and incongruent with the purpose of the Act. The court recognizes that it could stretch the summary judgment standards and decide the applicability of this defense to one or more of the violations that the parties have identified but argued in only the most general of ways. The value in doing this seems questionable, because neither side has carried its evidentiary burden for obtaining the relief requested in its motion. The court summarily denies both motions concerning the bona fide error defense.

## KANSAS CONSUMER PROTECTION ACT

■ The defendants argue they are entitled to summary judgment on this claim because they had no knowledge about the nature and extent of the plaintiff's disability and the plaintiff did not reveal the nature or extent of his disability during the collection calls. The defendants deny knowing any information "that allowed them to gain an advantage over Caputo or enabled them to make a misleading statement of opinion that they knew Caputo was likely to rely upon." (Dk.88, p. 11). The defendants then argue that the best evidence of no unconscionable conduct is the fact that the plaintiff never made any payments as a result of the collection calls. The defendants insist the plaintiff's own conduct prevented any possible overreaching as he questioned the callers, obtained legal counsel, and challenged the

---

**3.** The plaintiff also included in his reply brief a request that the court strike the affidavit of Joe DiLucia and issue an order barring DiLucia's testimony at trial. This request is denied on the procedural ground that it was not timely advanced by separate motion.

**4.** The defendants attach the plaintiff's response to interrogatory ten that spans thirty pages and lists one hundred and sixty-six violations of the FDCPA. Neither side makes any effort at grouping these violations into some manageable set of claims for purposes of the summary judgment proceedings.

validity of the debt. As for the allegation that the collections calls harassed or disgraced the plaintiff, the defendants deny any such intent behind the calls. The defendants ask the court to dismiss as a matter of law the plaintiff's claim of unconscionable business acts or practices.

The plaintiff points to his disclosure in the first telephone call that he was a "disabled veteran" and to Marzulli's effort to use that information against the plaintiff. Marzulli referred to the plaintiff's disabled condition numerous times during the first conversation which was transcribed and attached to the plaintiff's memorandum:

> Mr. Santos ("Marzulli"): ... And I'm talking about every creditor that you show in a credit report, how are you going to sit in front of a judge and explain to a judge that there was income due to you being a disabled vet. (pp. 7–8).
>
> Mr. Santos: ... And basically a judge is not going to listen to the fact of you know, your disabled, correct. "Okay? There's income coming in." (p. 9).
>
> Mr. Santos: Because if you're disabled, you're taking clients' money without any intention of repaying it back it's a federal offense.
>
> Mr. Caputo: Well, then get me on it. All right?
>
> Mr. Santos: Michael—
>
> Mr. Caputo: You're threatening me, and I don't like it.
>
> Mr. Santos: Michael, you've got 24 hours to have your attorney's name and number who is going to represent you. If not, we'll go ahead and recommend it to you in court. Do you understand me, Mike?
>
> Mr. Caputo: Well, you know-
>
> Mr. Santos: You want to play hardball, we can play hardball here in my firm.
>
> Mr. Caputo: Sure.
>
> Mr. Santos: Okay? But don't act like it's fine and dandy when you just stole $3,500 from my client's money with no intention of repaying it back.
>
> Mr. Caputo: How are you saying I stole this because I was disabled?
>
> Mr. Santos: Mike, you have no intentions, read the law book, Mike. You have willfully defrauded my clients a federal offense. You understand that?
>
> Mr. Caputo: And how so?
>
> Mr. Santos: How so, because haven't paid a dime for it, Mike. Neither have done to the other creditors, and a judge is going to see that. I'll make sure he sees it. Okay?
>
> Mr. Caputo: Uh-huh.
>
> Mr. Santos: You're not going to pay a dime to this account? I will make sure, okay, that we do an active litigation research we'll place a lien on everything you got. You understand me?
>
> Mr. Caputo: Well, you said you've already done that.
>
> Mr. Santos: I didn't say we did it, we're going to. And I'll make sure I send off your case tonight. You've got 24 hours to contact me for your audit tomorrow, Mike.
>
> Mr. Caputo: Well, that doesn't make sense. Hello? Hello? (pp. 11–13).

(Dk.107, Ex. L). As to whether these statements and others amount to unconscionable practices, the plaintiff argues the fact that he did not make any payments is not proof against this claim and does not sustain a contrary inference. The plaintiff contends he need only show he was aggrieved, not that he actually paid on the debt. The plaintiff argues there is sufficient evidence for this court to conclude after hearing all the evidence at trial that the defendants engaged in overreaching and unconscionable debt collection practices.

The Kansas Consumer Protection Act ("KCPA"), K.S.A. 50–627, prohibits a sup-

plier from engaging "in any unconscionable act or practice in connection with a consumer transaction." The Kansas Supreme Court has held that "an independent debt collection agency falls within the definition of a 'supplier' and is subject to the provisions of the KCPA" if three conditions are satisfied: (1) the debt arose from a consumer transaction; (2) the underlying consumer transaction involved a "supplier" and a "consumer" as defined in the KCPA; and (3) "[t]he conduct complained of, either deceptive or unconscionable, occurred during the collection of, or an attempt to collect, a debt which arose from the consumer transaction and was owed by the consumer to the original supplier." *State ex rel. Miller v. Midwest Serv. Bur. of Topeka, Inc.*, 229 Kan. 322, 329, 623 P.2d 1343 (1981). The defendants do not dispute the applicability of the KCPA to the alleged conduct and underlying transaction.

■ "A consumer who is aggrieved by a violation of this act may recover, but not in a class action, damages or a civil penalty as provided in subsection (a) of K.S.A. 50–636 and amendments thereto, whichever is greater." K.S.A. § 50–634(b). To bring an individual action, the plaintiff must be an aggrieved consumer, that is, suffered some "loss or injury" as a result of the violation. *Finstad v. Washburn University*, 252 Kan. 465, 473, 845 P.2d 685 (1993).[5] Unlike the students in *Finstad*, the plaintiff has demonstrated a genuine issue of material fact as to whether he was "damaged" by the alleged violations of the KCPA. The plaintiff alleges that as a result of these collection calls he felt threatened, traveled to Texas, sought the advice

of others, and suffered anxiety and other emotional problems. In defining "aggrieved" for purposes of the KCPA, the Kansas Supreme Court in *Finstad* looked to the following definition taken from *Fairfax Drainage District v. City of Kansas City*, 190 Kan. 308, 314–15, 374 P.2d 35 (1962):

A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected.

252 Kan. at 472, 845 P.2d 685. As alleged here, the defendants' collection calls constituted a threat that substantially grieved the plaintiff, denied him of personal rights, and imposed upon him the burden of seeking the assistance of third parties. The plaintiff has demonstrated a genuine issue of material fact that he was "aggrieved" by these telephone calls. *See Lowe v. Surpas Resource Corp.*, 253 F.Supp.2d 1209, 1228–29 (D.Kan.2003).

The defendants have not carried their burden of showing they are entitled to summary judgment on the merits of this claim. Even if it were to consider only the above quoted portion of this one recorded collection call, the court is satisfied that the plaintiff can present sufficient facts from which a trier of fact could conclude

---

5. In *Finstad*, the plaintiff students who had enrolled in the defendant university's court reporting program alleged that the university had violated the KCPA by representing in an academic course catalogue that its program was accredited or approved when in fact it was not yet certified. 252 Kan. at 465, 845

P.2d 685. The plaintiff students did not rely on this statement, as "many, if not all, of the students were unaware of the statement" because they enrolled prior to the catalogue's publication. 252 Kan. at 472, 845 P.2d 685. Thus, they were not aggrieved by the claimed violation.

that the defendant exploited the plaintiff's ignorance of the law and made misleading statements of opinion on which the plaintiff was likely to rely to his detriment. The court concurs with the plaintiff that the issue of unconscionable conduct is one to be decided after hearing all the evidence at trial. A reasonable person could certainly infer from the recorded conversations that it is oppressive, overreaching and unconscionable to accuse a debtor of committing fraud and a federal crime for not repaying a debt; to threaten a debtor with pursuing criminal charges, with obtaining a lien on everything he owns, and with having him summoned in court and audited by his creditors in twenty-four hours; and to indicate that an attorney had considered these measures and was waiting for the collector to authorize their immediate use.

■ Alternatively, the defendants contend the plaintiff is unable to show he is entitled to an enhanced penalty under K.S.A.1999 Supp. 50–677, which provides: If any person is found to have violated any provision of the Kansas consumer protection act, and such violation is committed against elder or disabled persons, in addition to any civil penalty otherwise provided by law, the court may impose an additional civil penalty not to exceed $10,000 for such violation.

The companion statute, K.S.A.1999 Supp. 50–678, lists the factors relevant in determining whether to impose this enhanced penalty, but it does not weigh the different factors nor establish any requirements or conditions for this penalty. That the defendants can argue the absence of one or more factors is not sufficient for summary judgment purposes, particularly when the plaintiff can counter with the presence of one or more factors. The decision to impose an enhanced penalty will require hearing all of the relevant evidence, evaluating the credibility of the same, and determining the relative weight of the different factors. Such a determination is not suited for this summary judgment proceeding.

■ Under this claim, the plaintiff moves for partial summary judgment on the issue that he is a "disabled person" as that term is defined at K.S.A.1999 Supp. 50–676, which provides in relevant part:

(b) "Disabled person" means a person who has physical or *mental impairment,* or both, which *substantially limits one or more of such person's major life activities.*

(c) "Major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and *working.*

(d) "Physical or mental impairment" means the following:

(1) . . . ; or

(2) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities.

. . . . .

(e) "Substantially limits" means:

(1) Unable to perform a major life activity that the average person in the general population can perform; or

(2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity . . . .

The plaintiff relies largely on a Department of Veterans Affair's (VA's) "Supplemental Statement of the Case" dated May 29, 1997, which increased the plaintiff's disability rating from 30% to 100% after evaluating his posttraumatic stress disor-

der ("PTSD"). (Dk.94, Ex. D). The statement includes the examiner's following opinions as reasons and bases:

... An evaluation of 100 percent is also assigned for inability to secure or follow a substantially gainful occupation.

. . . . .

... He reports problems with authority; ...; has daily intrusive recollections of traumatic events; ...; demonstrates a sense of foreshortened future; feels detached and disconnected from others; ...; he has had difficulty with poor sleep, anger, irritability, poor concentration, and exaggerated startle response; has physiological reactivity to psychological reminders of traumatic events; stays on guard all the time.... He has depressed mood; guilty feelings; thoughts of death; feelings of worthlessness; less restful sleep; gets paranoid and suspicious "when things don't work according to plans....

... Examiner noted the veteran is not employable now or into the foreseeable future, and his symptoms of PTSD preclude employment. Hospital report for admission 10–03–96 also showed the veteran as not capable of returning to full-time employment. Inability to secure or follow a substantially gainfully occupation meets the criteria for 100 percent evaluation. Since this is shown from the time of the veteran's hospital admission on 10–03–96, a schedular total disability evaluation is assigned from that date and the issue of temporary total evaluation is basically no longer for consideration. The condition is considered permanent since the examiner indicates

employment is not likely into the foreseeable future.

(Dk.94, Ex. D, pp. 1–2).[6] The plaintiff contends that this disability rating establishes that he suffers from PTSD which is a psychological disorder and which qualifies as a mental impairment. The plaintiff likewise points to the finding that he cannot work as the basis of the 100% disability rating and concludes this same finding shows he is substantially limited in the major life activity of work.

The defendants argue the statutory scheme under which the plaintiff was found 100% disabled uses different standards for evaluating disability from those employed under the KCPA. In making this argument, the defendants mistakenly believe the plaintiff's disability rating was made by the Social Security Administration rather than the Department of Veteran's Affairs. According to the defendants, these differences prevent the court from relying on this disability finding in deciding whether the plaintiff is disabled under the KCPA. One particular thrust of their argument is that "if the SSA awarded disability benefits on a finding that Caputo met the criteria for a listed disability, then that award would have been made without inquiring into his ability to find work within the economy." (Dk.104, p. 19). This argument is unsupported by the record as the VA examiner expressly found that Caputo is "not employable now or into the foreseeable future, and his symptoms of PTSD preclude employment." (Dk.94, Ex. D, p. 2). The defendants alternatively argue that plaintiff trained to be a truck driver after his career as a plumber ended

**6.** Though they admit to having produced exhibit D in response to the plaintiff's request for production and though they do not refer to their stipulation in the pretrial order concerning the foundation of all business records and the restriction of their objections to the relevancy of such exhibits, the defendants object to the plaintiff's use of this exhibit without a supporting Rule 56 affidavit that authenticates the exhibit. The court overrules the defendants' objection to this exhibit and is satisfied with its authenticity and admissibility by reason of the defendants' admission and stipulation.

with a knee injury and that the plaintiff voluntarily left this job only because he considered it to be a very dirty business. The defendants dispute that the disability rating is sufficient proof for a summary judgment finding on this issue of fact.

The defendants have not created any genuine issue of material fact as to whether the plaintiff's psychological disorder substantially limits his ability to work. That the plaintiff is substantially limited in his ability to work is a conclusion well-established by the VA disability rating; the deposition testimony of the plaintiff's expert witness, T. Herbert Shriver, Psy. D.; and the written report of the defendant's expert witness, George Hough, Ph. D. In the summary of his findings, the defendant's expert reported the following:

> Mr. Caputo began experiencing the emergence of his PTSD symptoms within several years after his return from Vietnam (by 1974). His history from that point forward is replete with severe drug and alcohol abuse and dependency; suicidality; violence toward others; inability to maintain long-term, gainful employment; severe relationship problems (with four divorces); and, of course, the full expression of the post-traumatic stress disorder. Confounding this presentation has been his recurrent Major Depression, as well as often being seen to display a schizoaffective disorder. The upshot of this history has been marked psychiatric impairment, marked instability in all major life functions, years of various medication trials, evaluations, and hospitalizations. He has been awarded SSI on psychiatric grounds, and he has been determined to 100% service-connected disabled for his PTSD since the mid–1990s. This is an enduring and well-documented pre-existing condition.

(Dk. 94, Report of George Hough, Ph. D., pp. 20–21). The defendants point to no evidence to controvert any of the facts and conclusions found in these exhibits. The plaintiff's motion for partial summary judgment is granted, and the court finds that the plaintiff is a disabled person as that term is defined at K.S.A.1999 Supp. 50–676(b).

**FRAUD**

 "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage." *Albers v. Nelson,* 248 Kan. 575, Syl. ¶ 5, 809 P.2d 1194 (1991). To be actionable, the alleged fraudulent representation "must relate to past or present fact, as opposed to mere opinions or puffing or promised actions in the future." *Timi v. Prescott State Bank,* 220 Kan. 377, 389, 553 P.2d 315 (1976) (citation omitted). "When alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citing in part *Edwards v. Phillips Petroleum Co.,* 187 Kan. 656, 360 P.2d 23 (1961)). "A promise to do something in the future, if the promisor had no intention at the time the promise was made to carry it out, is deceit, and if the promisor obtained anything of value by reason thereof, there is actionable fraud." *Gerhardt v. Harris,* 261 Kan. 1007, 1013–14, 934 P.2d 976 (1997) (citing *El Dorado Nat'l. Bank v. Eikmeier,* 133 Kan. 412, 420, 300 P. 1085 (1931)). The burden of proving fraud is by a preponderance of the evidence, which must be clear, convincing, and satisfactory.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, Syl. ¶ 7, 596 P.2d 816.

The defendants attack the plaintiff's fraud claim arguing that the plaintiff is unable to prove one or more required elements. Specifically, Marzulli denies having knowledge that some of his statements were false and asserts that some of his statements do not refer to past or present actions and were mere opinions. The defendants also challenge the plaintiff's ability to prove he relied on the statements or the reasonableness of his asserted reliance. The plaintiff responds that there is substantial circumstantial evidence to prove Marzulli's knowledge or reckless disregard for the truth. The plaintiff argues the statements conveyed the impression of being statements of fact, not opinions, and were made for the purpose of inducing the plaintiff's reliance on them. Even though he made not have any payments, the plaintiff points to his efforts at seeking the advice of a criminal defense attorney, fleeing to Texas, and enduring emotional distress as evidence of his reliance and injuries.

After considering all the evidence and arguments, the court is convinced that there are genuine issues of material fact which preclude summary judgment on these allegations of fraud. When placed within the context of the particular recorded telephone call, the statements appear to go beyond mere opinions and convey statements related to status, authority, intentions and likely consequences. There is sufficient circumstantial evidence for a reasonable jury to conclude from this record that Marzulli made several statements about the involvement of attorneys and the defendants' present intentions in reckless disregard of their truthfulness. As for the plaintiff's reliance upon these statements and the reasonableness of the same, genuine issues of material fact remain. The court denies the defendants' motion for partial summary judgment on these claims.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 To establish a claim of intentional infliction of emotional distress under Kansas law, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 257, 978 P.2d 922 (1999). Conduct is not extreme and outrageous unless a civilized society would regard it as exceeding the bounds of decency or utterly intolerable. *Wiehe v. Kukal*, 225 Kan. 478, 482, 592 P.2d 860 (1979). " 'The classic test is that liability may be found to exist when the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, Outrageous!' " *Mai v. Williams Indus., Inc.*, 899 F.Supp. 536, 542 (D.Kan.1995) (quoting *Fusaro v. First Family Mortgage Corp., Inc.*, 257 Kan. 794, 805, 897 P.2d 123, 131 (1995)). Liability also depends on clearing two threshold determinations by the court that "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and ... [that] the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981).

The Kansas Supreme Court has recognized that a "debtor impliedly consents for the creditor to take reasonable steps to

pursue payment even though it may result in actual, though not actionable, invasion of privacy" and that creditors "must be given some latitude to pursue reasonable methods of collecting debts even though such methods often might result in some inconvenience or embarrassment to the debtor." *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 820, 821, 529 P.2d 104 (1974). "Nonetheless, methods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis." 215 Kan. at 825, 529 P.2d 104. The Kansas Supreme Court in *Dawson* was persuaded that this tort should extend to debtor/creditor relationships when the creditor engages in extreme and outrageous conduct that a reasonable person would consider highly offensive and that causes severe emotional distress to the debtor. 215 Kan. at 822, 529 P.2d 104.

Looking at the substance of the first two telephone calls and construing them in the light most favorable to the plaintiff, the court believes that a reasonable person could conclude that Mr. Marzulli's comments exceeded the bounds of decency and were utterly intolerable. Early in the first telephone call, Mr. Marzulli referred to the income that the plaintiff was receiving as disabled veteran and remarked that a judge would require him to explain how that income was being spent without considering his disability. Also in the first call, Mr. Marzulli spoke of the plaintiff's situation as implicating criminal conduct and charges:

> And secondly, I don't know if you know what the charge of upping in the State of Kansas it is willfully defrauding my client, which is called stealing, a federal offense-O.K. (p. 8).

> Because if you're disabled, you're taking clients' money without any intention of repaying it back it's a federal offense. (p. 11).

> But don't act like its fine and dandy when you just stole $3,500 from my client's money with no intention of repaying it back. (p. 12).

> Mike, you have intentions, read the law book, Mike. You have willfully defrauded my clients a federal offense. You understand that?

> **Mr. Caputo:** And how so?

> **Mr. Santos ("Marzulli"):** How so, because you haven't paid a dime for it, Mike. Neither have you done to the other creditors, and a judge is going to see that. I'll make sure he sees it. Okay? (p. 12).

(Dk.107, Ex. L). When the plaintiff said that he felt threatened and didn't like this treatment, Mr. Marzulli responded, "Michael, you've got 24 hours to have your attorney's name and number who is going to represent you. If not, we'll go ahead and recommend it to you in court. Do you understand me, Mike." *Id.* at pp. 11–12. In the second telephone call when the plaintiff asked Mr. Marzulli about the fraud charges, Mr. Marzulli did not clear up any confusion about his statements but rather said, "Well, that were the charges that the attorneys wanted to go and proceed." *Id.* at 17. When the plaintiff asked if the attorneys were still talking about fraud charges, Mr. Marzulli answered, "Well, here's-I had spoken to the attorneys today. If you initially were between $3 and $400. We can get you out of the legal fee. If not, we have no other choice but go ahead and recommend you for summons." *Id.* at 18. Later, the conversation became more heated:

> **Mr. Caputo:** I have never committed fraud in my life. So if your attorneys want to do that because I can't talk to my attorney in their time schedule go, do.

Mr. Santos ("Marzulli"): You've got federal taxes and state tax liens, Mike. You're a habitual debtor, Mike.

Mr. Caputo: Do it.

Mr. Santos: Why don't you take responsibility and be a man to try to get these things resolved?

Mr. Caputo: Are you telling me I'm not a man?

Mr. Santos: I'm telling you to resolve your debts, Mike, in accordance of your state.

Mr. Caputo: Well, you made a comment.

Mr. Santos: I made a comment. Yes, I did. I took-you know, if you want to be an adult and a responsibility of the legal and binding contract that you signed with every creditor out there, Mike, okay? Because, I'll make sure that every other creditor gets and knows that you will be recommended and be taken to court. If they want to do it also, then guess what, Mike? You'll have about 10 charge-offs on your account, No. 1, and you're going to have 10 civil judgments against you. You want to go that route, we can play hardball here.

*Id.* at pp. 27–28. Accusing the debtor of federal offenses, impliedly threatening to initiate criminal charges, personally attacking the debtor's manhood and maturity, threatening lawsuits and liens on all property, and threatening to tell all other creditors about his situation, all of which was said during two telephone calls, exceed the bounds of reasonable debt collection methods and could reasonably be termed extreme and outrageous conduct in the context of this case. As reflected in the conversations, Marzulli understood and assumed that the plaintiff was a disabled veteran whose only apparent source of income was disability benefits. While Marzulli may not have known or chose not to learn the nature of the plaintiff's disability, he should have known it was so serious as to preclude the from working and to entitle the plaintiff to benefits. In addition, Marzulli attempted to exploit the plaintiff's disability by using it as a premise to his accusation that the plaintiff criminally defrauded his client and by chiding the plaintiff that his disability would not protect him in court. An average citizen hearing of these facts could be aroused to exclaim, Outrageous!

The plaintiff has retained the services of a psychologist who will testify that these threatening collection calls caused a marked reaction and deterioration in the plaintiff because he is "psychologically vulnerable and fragile." (Dk. 107, Herbert Shriver Dep. Ex. 1, p. 6). Subjectively, the plaintiff's "personal security has been threatened; resulting in increased isolation, depression, regression to a pretreatment status." *Id.* The psychologist points to the objective indicators in the medical record that substantiate this severe emotional distress: "increased therapy, self isolation (in the woods), planning his own death, subsequent change in medication as well as his psychologists' assessment of this patients regressed paranoid states following the altercation." *Id.* This expert witness opines that "[t]his situation has caused Mr. Caputo a significant amount of added and needless suffering." *Id.* Such evidence is sufficient to create a genuine issue of material fact as to whether the plaintiff suffered severe emotional distress as a result of these collection calls. This is not the proceeding for parsing the plaintiff's medical records, drawing inferences about the presence of other stressors in the plaintiff's life, comparing the effect of other stressors with the effect of the collection calls, and doubting that a reasonable person would consider the plaintiff's emotional distress to be severe. The defendants' efforts in this regard are not persuasive in showing they are entitled to summary judgment.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment on plaintiff's claims under the Fair Debt Collection Practices Act, fraud and outrage and partial summary judgment on plaintiff's claims on unconscionable business practices and entitlement to an enhanced penalty under the Kansas Consumer Protection Act (Dk.87) is denied;

IT IS FURTHER ORDERED that the plaintiff's motion for partial summary judgment to bar the defendant from presenting a bona fide error defense pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692(k) (Dk.91) is denied;

IT IS FURTHER ORDERED that the plaintiff's motion for partial summary judgment to have the court declare him a "disabled person" as defined under the Kansas Consumer Protection Act, K.S.A. 2000 Supp. § 50–676(b) (Dk.93) is granted.